[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 28, 2004
THOMAS K. KAHN
CLERK

_____

No. 03-13526

_____

DOL No. 02-00817 BLA-BRB

U.S. STEEL MINING COMPANY, LLC,

Petitioner,

versus

DIRECTOR, OWCP,
RODERICK JONES,

Respondents.

_____

Petition for Review of an Order of the
Benefits Review Board United States Department of Labor

_____

**(September 28, 2004)**

Before BIRCH, MARCUS and BRUNETTI*, Circuit Judges.

MARCUS, Circuit Judge:

_____

*Honorable Melvin Brunetti, United States Circuit Judge for the Ninth Circuit, sitting by designation.

U.S. Steel Mining Company ("U.S. Steel") appeals from the final order of the Department of Labor's Benefits Review Board ("BRB") affirming the award of black lung benefits to Roderick Jones ("Jones"), a former coal miner. An Administrative Law Judge ("ALJ") granted benefits to Jones on his second claim under the Black Lung Benefits Act ("the Act" or "the BLBA"), 30 U.S.C. §§ 901-945, after finding that Jones was totally disabled by pneumoconiosis -- or black lung disease[1] -- that developed as a result of his work in the coal mines of Alabama. On appeal, U.S. Steel says that the ALJ used the wrong legal standard in evaluating whether there was a material change in Jones's condition, a prerequisite to Jones's second claim under the Act, and that the ALJ reached the wrong decision on the merits. After thorough review, we are persuaded by neither argument and, accordingly, affirm the judgment of the BRB.

## I.

### A.

The procedural history, essential background and developed facts are straightforward. The Secretary of Labor's black lung benefits program allows coal

---

[1]The BLBA provides "for the payment of benefits to a coal miner who is totally disabled due to pneumoconiosis (black lung disease)." 20 C.F.R. § 725.1. The Act defines "pneumoconiosis" as "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." 30 U.S.C. § 902(b).

2

miners to file more than one benefits claim under certain circumstances. After the

first claim by a miner is denied, the claimant may file a second or "duplicate"

application more than one year after the denial of the first claim.[2] In order to file a

duplicate claim, the miner must first establish that "a material change in

conditions" has occurred since the earlier denial of the first claim. 20 C.F.R. §

725.309(d). Indeed, duplicate claims are feasible under the BLBA precisely

because pneumoconiosis is a latent and progressive disease, from which a miner's

condition may deteriorate over time. As a result, if a miner's condition has

materially changed, he may allege a new cause of action based on a very different

physical condition. See, e.g., Coleman v. Director, OWCP, 345 F.3d 861, 863

(11th Cir. 2003) (per curiam) ("Because pneumoconiosis is a latent and

progressive disease, a miner's condition may worsen over time. In recognition of

that fact, the Labor Department's regulations permit a miner whose first claim has

been denied to pursue a later claim for benefits, provided the miner can establish a

---

[2]The relevant regulation, 20 C.F.R. § 725.309, was revised in 2000, and "duplicate" claims filed after January 19, 2001 are now denominated "subsequent" claims. However, because Jones's claim was filed on August 2, 1999, the prior version of § 725.309 applies, and, accordingly, we refer to Jones's second claim as a "duplicate" claim. Prior to the 2000 revisions, 20 C.F.R. § 725.309(d) provided in relevant part that "[i]f the earlier miner's claim has been finally denied, the later claim shall also be denied, on the grounds of the prior denial, unless . . . there has been a material change in conditions . . . ." 20 C.F.R. § 725.309(d) (1999). Unless otherwise noted, all references to § 725.309(d) in this opinion refer to the version of the regulation in effect before the 2000 Amendments.

change in conditions of entitlement." (citation omitted)); Labelle Processing Co. v. Swarrow, 72 F.3d 308, 313-16 (3d Cir. 1995).  The Director of the U.S. Department of Labor's Office of Workers' Compensation Programs ("the Director"), has taken the position that a claimant may establish a "material change" by proving any element of entitlement in the second claim that the miner failed to show in the first one.

Jones filed his original claim for black lung benefits on October 22, 1997. The claim was denied by the U.S. Department of Labor's District Director ("District Director"), who concluded that Jones had failed to establish any of the elements of black lung eligibility.  Jones did not appeal the denial of his first claim.

Almost two years later, Jones brought this claim on August 2, 1999, seeking benefits for himself, his wife, and four dependent children.  Because Jones's second claim was filed more than a year after the denial of the first one, this claim was a "duplicate claim" governed by 20 C.F.R. § 725.309(d), and, therefore, Jones had to prove by a preponderance of the evidence that a "material change in conditions" had occurred since the denial of his initial claim.  Id.  After meeting this threshold requirement, Jones also had to establish that: (1) he had pneumoconiosis; (2) the pneumoconiosis arose out of coal mine employment; (3)

4

he was totally disabled; and (4) the pneumoconiosis contributed to the total disability. Id. § 725.202(d)(2).

The District Director denied Jones's duplicate (or second) claim on September 6, 2000, after which Jones filed a timely request for a hearing.[3] On October 23, 2001, a hearing was conducted in Birmingham, Alabama, before an ALJ. In a decision and order dated August 1, 2002, the ALJ determined that Jones and his family were entitled to an award of benefits. U.S. Steel timely appealed to the BRB, and, in a decision and order dated May 16, 2003, a three-judge panel of the BRB affirmed the ALJ's order.

B.

---

[3]The procedure miners may use to bring a duplicate or second claim is similar to the one used when filing an initial claim. The duplicate claim is first filed with the District Director, who develops and processes the evidence associated with the claim. 20 C.F.R. § 725.401 et seq. After the parties have submitted evidence, the District Director will issue a proposed decision and order resolving the claim by awarding or denying benefits. Id. § 725.418. Within 30 days of the issuance of a proposed decision and order, either party may request a revision to the proposed decision and order or may request a hearing. Id. § 725.419. If any party requests a hearing, or if the District Director determines that a hearing is necessary, the claim is referred to the Chief Administrative Law Judge, id. § 725.451, who designates an ALJ to hear the claim, see id. § 725.452. Notice of the hearing is given to all parties, see id. § 725.453, and after all the evidence has been received, the witnesses heard, and the pleadings and briefs submitted to the ALJ, the hearing is terminated, id. § 725.475, and within 20 days the ALJ will issue a decision and order awarding benefits or rejecting the claim. See id. § 725.476. Parties then have 30 days to request a reconsideration of the ALJ's decision, see id. § 725.479, or to appeal the decision to the BRB, see id. § 725.481. Following the BRB's decision, aggrieved parties have 60 days to file a petition for review of the BRB's decision within the appropriate United States Court of Appeals. See id. § 725.482.

It is undisputed that Roderick Jones worked for twenty-two years as a coal miner in Alabama, before leaving the mines in 1993, at the age of 41. At the hearing, Jones explained that he quit working as a miner because his "body wouldn't take it anymore," and that "it came to the point that I couldn't breathe and do a job like I should do it." Since leaving the mines, Jones has not worked, except as a pastor in his church. Jones has never smoked cigarettes, pipes, or cigars. Besides working as a coal miner, he has never held any employment in which he was exposed to pulmonary irritants.

Jones currently suffers from substantial breathing difficulties. He easily becomes short of breath after minimal exertion, such as climbing a single flight of stairs, mowing his lawn, or playing basketball with his children for more than "a little bit." He occasionally suffers from "uncontrollable coughing," a condition which worsens at night and requires him to sleep propped up on four or five pillows. In the year preceding the ALJ hearing, Jones's breathing difficulties forced him to visit a hospital emergency room on multiple occasions, where he was put on a breathing machine. Jones has been prescribed prednisone pills and inhalers to help with his breathing, and he also takes medication for atrial fibrillation, or an irregular heartbeat, which was diagnosed in 1979.

Because, under the Act, the characterization of a coal miner as being totally disabled depends in part on whether the miner is unable to perform his "usual coal mine work," 20 C.F.R. § 718.204(b)(1), we examine the work Jones engaged in during the last period of his employment. See Shortridge v. Beatrice Pocahontas Coal Co., 4 BLR 1-534, 1-539 (1982) ("[U]sual coal mine work is the most recent job the miner performed regularly and over a substantial period of time."). The last job Jones performed regularly and over a substantial period of time was a faceman.

As a faceman, Jones was required to build cement block walls inside the mine. This work caused him to regularly lift 100-pound bags of cement and 50-pound bags of rock dust, and to lift cement blocks weighing 40 pounds. Sometimes Jones was required to lift the 40-pound blocks above his head. His job also required him to lift bundles of roof-bolting pins, which could weigh from 80 to 150 pounds, and to carry these bundles for distances of up to 1600 feet. Jones also unloaded mining cars which contained approximately 300 50- to 100-pound bags of rock dust. Jones unloaded the rock dust bags, cut them open, and spread the rock dust within the mine shafts, a dirty and dusty task. In addition, Jones shoveled wet coal spillage from the belt line that took the coal out of the mine, requiring him to shovel 40- to 50-pound loads of wet coal. Finally, Jones

7

sometimes filled the mine's grout machine, which required him to unload 50- to 100-pound bags of cement and dump them into the machine.

Since 1997, a number of doctors have examined Jones or his medical records, and come to varying conclusions concerning his medical condition and the causes of that condition. Because these differences in medical opinion play a central role in the resolution of this appeal, we describe the range of medical evidence presented in some detail.

Dr. Goldstein, a board-certified pulmonary specialist and B-reader,[4] examined Jones the first time he applied for black lung benefits, in December 1997. Dr. Goldstein read Jones's lung x-ray as being negative for pneumoconiosis[5] and found no pulmonary impairment. However, Dr. Goldstein diagnosed a cardiac arrhythmia, chest pain, and a restrictive lung defect. Goldstein did not opine on the cause of the restrictive lung defect, simply writing "? etiology" in his report. Dr. Goldstein found Jones to be 100% disabled because of his cardiac arrhythmia.

---

[4]A B-reader is a physician who has demonstrated proficiency in assessing and classifying lung x-ray evidence for pneumoconiosis by passing an exam established by the National Institute of Safety and Health and administered by the U.S. Department of Health and Human Services. 20 C.F.R. § 718.202(a)(1)(ii)(E); 42 C.F.R. § 37.51. Courts generally accord greater weight to x-ray readings performed by B-readers. See Swarrow, 72 F.3d at 310 n.3.

[5]Dr. Sargent, another B-reader and a board-certified radiologist, also reviewed the December 1997 x-ray and also found it to be negative for pneumoconiosis.

Dr. Cohen, another board-certified pulmonary specialist, conducted a new pulmonary examination of Jones in October 1999 in connection with Jones's second claim. Dr. Cohen reviewed Jones's work and medical histories, respiratory symptoms, and physical examination. Dr. Cohen identified pneumoconiosis, classified as 1/0, on an x-ray of Jones's lungs taken on October 12, 1999,[6] determining that the x-ray showed signs of pneumoconiosis in Jones's middle and upper lung zones.[7] Dr. Cohen also conducted a pulmonary function study that revealed mild reductions in Jones's total lung capacity and a mild diffusion impairment; he also conducted blood gas testing, which indicated a reduced capacity of Jones's lungs to oxygenate his blood. Dr. Cohen observed that some of the shortness of breath Jones experienced was associated with the exacerbation of his arrhythmia, but, notably, that many of Jones's symptoms were altogether independent of the diagnosed arrhythmia. Because of the x-ray evidence, as well

---

[6]Chest x-rays used to establish pneumoconiosis are categorized according to the classification system contained in a document entitled the International Labour Organization Union Internationale Contra Cancer/Cincinnati (1971) International Classification of Radiographs of the Pneumoconioses ("the ILO Classification System"). See 20 C.F.R. § 718.102(b); see also Am. Mining Cong. v. Mine Safety & Health Admin., 995 F.2d 1106, 1108 (D.C. Cir. 1993) ("The ILO classification system uses a 12-step scale to measure the concentration of opacities (i.e., areas of darkness or shading) on chest x-rays. A 1/0 rating is the fourth most severe of the ratings."). Chest x-rays classified as category 0-, 0/0, or 0/1 are read as negative for pneumoconiosis. 20 C.F.R. § 718.102(b). A 1/0 classification indicates the presence of pneumoconiosis. Id.

[7]Dr. Goldstein also reviewed the October 12, 1999 x-ray, but found it to be negative for pneumoconiosis, as did Dr. Sargent.

as the impairment evident in Jones's pulmonary function test, Dr. Cohen unambiguously diagnosed Jones as suffering from coal miners' pneumoconiosis. Dr. Cohen also concluded that, because of the exertion required in Jones's last mining job, he was <u>totally</u> disabled.

Dr. Cohen issued a second report on September 27, 2001, after reviewing the original evaluation by Dr. Goldstein, as well as the various chest x-rays. Dr. Cohen again concluded -- "to a reasonable degree of medical certainty" -- that Jones suffered from coal workers' pneumoconiosis, and that the condition was "substantially related" to Jones's mining employment. Dr. Cohen acknowledged that some of the x-ray evidence did <u>not</u> indicate pneumoconiosis, but opined that this did not undermine his diagnosis that there was clinical and physiological evidence of pneumoconiosis.[8]

Dr. Marder, who is board-certified in occupational and preventive medicine, reviewed the reports authored by Drs. Goldstein and Cohen and submitted a report of his own on October 1, 2001. He concluded that Jones has a restrictive lung defect. Unlike Dr. Goldstein, who declined to opine on the cause of Jones's lung defect, Dr. Marder concluded that the defect was actually caused by

---

[8]Title 20 C.F.R. § 718.202(a)(4) specifically provides that a diagnosis of pneumoconiosis based on "sound medical judgment" and "objective medical evidence" may be made "notwithstanding a negative X-ray."

pneumoconiosis from coal dust exposure. Dr. Marder further opined that, while some of the chest x-rays had been negative for pneumoconiosis, it was well established that the disease could be present even if not apparent from a reading of the x-rays.

Dr. Askew, a board-certified internist and Jones's treating physician since 1990, also issued a report on October 4, 2001, based both on his experience treating Jones and his review of the pulmonary function test administered by Dr. Cohen. Dr. Askew also concluded that Jones's restrictive lung impairment had been caused by coal dust exposure and that Jones suffered from pneumoconiosis. Like Dr. Marder, Dr. Askew noted that the presence of negative x-rays did not rule out a diagnosis of pneumoconiosis.

The last doctor to weigh in on Jones's medical condition was Dr. Fino, a board-certified pulmonologist and B-reader. Dr. Fino issued his own report on February 1, 2002 based on his review of the medical records associated with both of Jones's claims, as well as the reports issued by Drs. Goldstein, Cohen, Marder, and Askew. Dr. Fino concluded that Jones's reduced lung capacity was "consistent with a very mild to mild restrictive ventilatory defect." While Dr. Fino noted that it would be "unusual" to have a case of simple coal workers' pneumoconiosis in the absence of "significant, severe" x-ray evidence of the

11

disease, he did not say that it was impossible to diagnose pneumoconiosis without x-ray evidence.[9]  Ultimately, Dr. Fino concluded that the conditions in Jones's lungs were not caused by coal dust inhalation, but were likely the result of other factors, including coronary artery disease and an irregular heartbeat.  While Dr. Fino concluded that Jones did not suffer from pneumoconiosis, he did determine that Jones's other ailments rendered him "clearly" disabled.

In short,  Drs. Cohen, Marder, and Askew concluded that Jones suffered from pneumoconiosis, while Drs. Goldstein and Fino found that he did not. Although Drs. Goldstein and Fino agreed with Drs. Cohen, Marder, and Askew that Jones was totally disabled, they attributed his total disability to causes other than pneumoconiosis.

The ALJ, at the October 2001 hearing, considered the various x-rays and the other tests that had been performed on Jones, as well as all of the medical opinions presented.  The ALJ first determined that Jones had satisfied the threshold requirement of establishing a material change in condition by showing that he now suffered from pneumoconiosis, in contrast with the finding that Jones had not

---

[9]Dr. Fino read x-rays taken on October 12, 2000 as being negative for pneumoconiosis. Two other doctors, however, found evidence of pneumoconiosis in these October 2000 x-rays. Dr. Cappiello, a board-certified radiologist and B-reader, read the x-ray as 1/0, as did Dr. Ahmed, another board-certified radiologist whose B-reader certificate was out of date when he read Jones's x-rays.

suffered from the disease in 1997. Having concluded that Jones suffered from pneumoconiosis at the time of his duplicate or second claim, the ALJ also determined that Jones's pneumoconiosis arose out of his employment in the coal mines of Alabama and that it was a "substantially contributing cause" of his total disability. Accordingly, the ALJ concluded that Jones was entitled to, and awarded him benefits. The BRB affirmed the award and this appeal ensued.

## II.

### A.

The standard we employ in reviewing the BRB's review of an ALJ's decision is by now well established. In Lollar v. Alabama By-Products Corp., we explained the standard in these terms:

> Decisions of the ALJ are reviewable only as to whether they are in accordance with law and supported by substantial evidence in light of the entire record. This deferential standard of review binds both the BRB and this Court. See Jordan v. Benefits Review Bd., 876 F.2d 1455, 1459 (11th Cir. 1989); Stomps v. Director, OWCP, 816 F.2d 1533, 1534 (11th Cir. 1987); Alabama By-Products Corp. v. Killingsworth, 733 F.2d 1511, 1515 (11th Cir. 1984). Because this Court applies the same standard of review to ALJ decisions as does the BRB, our review of BRB decisions is de novo. "Substantial evidence" has been defined as "more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (citation and internal quotation marks omitted).

893 F.2d 1258, 1261-62 (11th Cir. 1990) (footnote omitted). As we observed in Lollar, when "the BRB upholds the ALJ's decision, this Court's limited review of the ALJ effectively cloaks the BRB's decision with the same deference to which the ALJ is entitled." Id. at 1261 n.4. "Thus, although the case comes to us from the BRB, we begin our analysis by reviewing the decision of the ALJ." Bradberry v. Director, 117 F.3d 1361, 1365 (11th Cir. 1997).

B.

The central legal issue presented is whether the ALJ erred by using the "one element" standard to evaluate whether Jones had established a "material change in conditions," a necessary finding to bringing a second (duplicate) claim. See 20 C.F.R. § 725.309(d). The ALJ concluded that "[t]o establish a material change in conditions, Claimant must prove, by a preponderance of the evidence developed since the denial of the prior claim, at least one of the elements previously adjudicated against him." Jones v. U.S. Steel Mining Co., Decision and Order - Awarding Benefits at 3, Case No. 2001-BLA-356 (U.S. Dep't of Labor Office of Admin. Law Judges Aug. 1, 2002) ("ALJ Order"). We have not had occasion to rule on the proper legal standard, an issue that has caused a split among our sister circuits.

14

The Director has advocated the "one element" standard for evaluating whether or not a miner has proved a material change in conditions.[10] Under this standard, when making a duplicate claim, a claimant can establish a material change in conditions by proving one entitlement requirement that was previously resolved against the miner. After establishing a material change, to be eligible for benefits a miner must then prove that (1) he has pneumoconiosis; (2) his pneumoconiosis arose out of his coal mining employment; (3) he is totally disabled; and (4) the pneumoconiosis contributed to his disability. 20 C.F.R. § 725.202(d)(2)(i)-(iv); see also Black Diamond Coal Mining Co. v. Director, OWCP, 95 F.3d 1079, 1082 (11th Cir. 1996). If all of the requirements were resolved against a miner in his first claim -- as was the case with Jones -- the claimant can establish a material change under the "one element" test by establishing any one of the four eligibility elements in the second claim. If a miner successfully proves a material change in this way, the entire record is then examined to determine whether, at the time of the second claim, the miner has proven all of the eligibility requirements and, thus, may be granted an award of benefits.

_____

[10]Jones also urges this Court to adopt the Director's "one element" standard.

15

U.S. Steel urges us to reject the Director's "one element" standard and instead to adopt a standard enunciated by the Seventh Circuit in <u>Sahara Coal Co. v. Office of Workers' Comp. Programs</u>, 946 F.2d 554 (7th Cir. 1991), which U.S. Steel contends "require[s] a genuine showing of changed conditions." Petitioner's Brief at 19. Under this test, U.S. Steel argues, to prove a "material change," "Jones must establish either (1) that the disease of pneumoconiosis has manifested itself since the earlier denial or (2) that the disease's progress has resulted in total disability although it was not totally disabling at the time of the original application." <u>Id.</u>; <u>see</u> <u>also</u> <u>Sahara Coal</u>, 946 F.2d at 556 (outlining material change test in which a miner would have to establish that he "did not have black lung disease at the time of the first application but has since contracted it and become totally disabled by it, or that his disease has progressed to the point of becoming totally disabling although it was not at the time of the first application").

The essential difference between the Director's "one element" test and the standard urged by U.S. Steel involves the treatment of the evidence presented in the first claim and the decisions reached therein. Under the Director's standard, new evidence proffered in the second claim is compared with the <u>conclusions</u> reached in the final adjudication of the first claim. Thus, the first claim is presumed to have been correctly decided, given the miner's condition at that time.

16

U.S. Steel's test, in contrast, would require a comparison of the new evidence with the evidence submitted in the first claim, in order to evaluate whether or not the claimant's condition had changed over time. Rather than accepting the final adjudication of the first claim as correct, U.S. Steel's standard would subject that decision to searching scrutiny, since it requires looking anew at the evidence from that claim.

In evaluating whether to adopt the Director's standard or the one urged by U.S. Steel, "'[i]t is well-established that courts must defer to an agency's consistent interpretation of its own regulation unless it is plainly erroneous or inconsistent with the regulation.'" Bradberry, 117 F.3d at 1366 (quoting Lollar, 893 F.2d at 1262 (adopting Director's construction of test for disability causation)). Here, this deference is specifically owed to the Director of the Office of Workers' Compensation Programs, not to the ALJ or the BRB. Lollar, 893 F.2d at 1262.

The obligation to defer to an agency's reasonable interpretation of its own regulations is rooted not only in our case law, but also in binding Supreme Court precedent. See, e.g., Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-45, 104 S. Ct. 2778, 2782-83, 81 L. Ed. 2d 694 (1984); see also Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 696-97, 111 S. Ct. 2524, 2534,

17

115 L. Ed. 2d 604 (1991) (granting deference to the Department of Labor's construction of its own black lung regulation, and noting that Congress intended to delegate broad policymaking authority to the Department of Labor when it passed the Act); Mullins Coal Co. of Va. v. Director, Office of Workers' Comp. Programs, 484 U.S. 135, 159, 108 S. Ct. 427, 440, 98 L. Ed. 2d 450 (1987). The Supreme Court has left no doubt that when an agency has regularly advocated a uniform interpretation of its regulation, the interpretation "is deserving of substantial deference 'unless it is plainly erroneous or inconsistent with the regulation.'" Mullins Coal, 484 U.S. at 159, 108 S. Ct. at 440 (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)).

Deference to an agency's consistent interpretation of its own regulations is due when the agency has consistently "maintained a longstanding policy on the subject," McKee v. Sullivan, 903 F.2d 1436, 1438 n.3 (11th Cir. 1990), but not when an agency adopts a "mere litigating position." William Bros., Inc. v. Pate, 833 F.2d 261, 265 (11th Cir. 1987); see also Bradberry, 117 F.3d at 1366. That is, we do not afford deference to ad hoc positions of agencies adopted in reaction to the exigencies of litigation; rather, deference is due when an agency has taken a constant and unchanging -- and reasonable -- position on the proper interpretation

18

of its regulation.  See Bradberry, 117 F.3d at 1366; William Bros., 833 F.2d at 265.

Applying these principles to the issue at hand, the Department of Labor has adopted the "one element" test as a national rule, and has consistently promulgated a uniform definition of "material change in conditions" based on the "one element" standard.  As part of an extended rule-making process, the Department proposed rules designed to make the black lung program fairer and more efficient.  The Department first published the proposed rules in 1997, 62 Fed. Reg. 3338 (Jan. 22, 1997), modified them in 1999, 64 Fed. Reg. 54,966 (Oct. 8, 1999), and finalized them in 2000, 65 Fed. Reg. 79,920 (Dec. 20, 2000).  These new rules formally codified the "one element" test as the Director's national policy.  See 65 Fed. Reg. 79,968-75 (Dec. 20, 2000).

The Director has not simply promoted the use of the standard in this case; to the contrary, the Director has consistently advocated the use of the "one element" test before the courts of appeals.  See, e.g., Swarrow, 72 F.3d at 318; Lisa Lee Mines v. Director, OWCP, 86 F.3d 1358, 1363-64 (4th Cir. 1996) (en banc); Sharondale Corp. v. Ross, 42 F.3d 993, 998 (6th Cir. 1994); Peabody Coal Co. v. Spese, 117 F.3d 1001, 1007-09 (7th Cir. 1997) (en banc);  Lovilia Coal Co. v.

Harvey, 109 F.3d 445, 454 (8th Cir. 1997); Wyoming Fuel Co. v. Director, 90

F.3d 1502, 1510-11 (10th Cir. 1996).

The Director has formulated the "one element" standard in these terms:

> For purposes of a duplicate miner's claim, (i) the claimant must establish at least one element of entitlement previously rejected in the earlier claim; and (ii) the claimant must prove the elements of entitlement by a preponderance of the new evidence developed in conjunction with the duplicate claim that addresses his present physical condition. If the claimant satisfies the initial burden of proving a "material change," then the adjudicator must consider all the evidence from all the claims to determine whether the claimant has proven the remaining elements of entitlement.

Federal Respondent's Brief at 17-18. Because the Director's "one element"

standard is neither plainly erroneous nor inconsistent with the regulation it

interprets, and because the Director has consistently advocated its use before the

federal courts of appeals, we can discern "no reason to downgrade the normal

deference accorded to [the] agency's interpretation of its own regulation." Mullins

Coal, 484 U.S. at 159-60, 108 S. Ct. at 440-41.

In showing deference to the Director's uniform interpretation of the

agency's regulation, we align ourselves with a clear majority of our sister circuits

that has adopted the "one element" test. While one circuit -- the Tenth -- has

20

rejected the "one element" test, see Wyoming Fuel Co., 90 F.3d at 1510-11,[11] five others -- the Third, Fourth, Sixth, Seventh and Eighth -- have adopted at least some version of the "one element" test.  See Swarrow, 72 F.3d at 318; Lisa Lee Mines, 86 F.3d at 1363-64; Sharondale, 42 F.3d at 998; Peabody Coal, 117 F.3d at 1007-09;  Lovilia Coal Co., 109 F.3d at 454.

The Third, Fourth, and Eighth Circuits have unambiguously embraced the Director's "one element" test.  In Swarrow, for example, a panel of the Third Circuit noted that deference to the Director's interpretation of its own regulations was warranted so long as the Director's interpretation was a reasonable one.  72 F.3d at 318 (citing Chevron, 467 U.S. at 845, 104 S. Ct. at 2783).  The court observed that it would supply its own construction of a regulation only if the agency's interpretation were plainly erroneous or inconsistent with the regulation, and concluded that the Director's construction of the regulation was neither.  Id.

---

[11]Of all the Circuits to consider this issue, only the Tenth Circuit has rejected the Director's "one element" test.  In Wyoming Fuel Co., the Tenth Circuit advanced a standard in which a material change is established only if the miner can show, by comparing the old and new evidence, that the specific elements adjudicated against him in the first claim have worsened since the initial denial.  90 F.3d at 1511. The Tenth Circuit recognized that if a particular element was not decided in the first claim, then res judicata does not require the miner to show a change in that element, since there can be no issue preclusion as to that specific element.  Id. at 1511 n.13.  However, under the Wyoming Fuel Co. standard, a miner must show a material change in each element that actually was adjudicated against him, as opposed to showing a change as to only a single element.  Id. at 1511.

(citation omitted). In embracing the "one element" standard, the Third Circuit also noted that "[a]doption of the Director's interpretation accords with the principle that courts should liberally construe remedial legislation, such as the BLBA, so as to include the largest number of claimants within its entitlement provisions." Id. The Third Circuit concluded that "[b]ecause the Director's construction of its own regulation is not unreasonable, deference should be given to that interpretation," and adopted the "one element" test. Id.

The Fourth Circuit, similarly, adopted the "one element" standard in Lisa Lee Mines, 86 F.3d at 1363-64. The Fourth Circuit observed that a duplicate claim is not barred, "as a matter of ordinary res judicata, by an earlier denial, because the claims are not the same. The health of a human being is not susceptible to once-in-a-lifetime adjudication." Id. at 1362. Thus, given the progressive and degenerative nature of pneumoconiosis, a claim based on a miner's health today may be different from a claim based on his health more than a year ago. The court, therefore, recognized the problems inherent in requiring a miner to compare the evidence adduced from the old claim with the evidence presented in the new claim as a condition precedent to filing the second claim. It concluded, instead, that a "material change" should be assessed by comparing the new evidence with the conclusions reached in the first decision.

22

Accepting the correctness of a final judgment is more than legalistic tunnel vision; it is a practical -- perhaps the only practical -- way to discern a concrete form in the mists of the past. The ease we might feel at second-guessing this final judgment ought not tempt us to overestimate our retrospective perspicacity; most black lung claims involve a mixed bag of test results and wildly divergent medical opinions. The final decision of the ALJ (or BRB or claims examiner) on the spot is the best evidence of truth at the time.

Id. at 1361. The concern for respecting the finality of the prior denial led the Fourth Circuit to "defer to the Director's reasonable interpretation of the duplicate claims regulation," id. at 1363, and adopt the "one element" test.

In also embracing the Director's standard, the Eighth Circuit traced the reasoning of the Third and Fourth Circuits before concluding that "the Director's interpretation of 20 C.F.R. § 725.309(d) is reasonable," Lovilia Coal Co., 109 F.3d at 454, and therefore deserving of deference. The Eighth Circuit accepted the Director's argument that the "one-element standard promotes administrative and judicial efficiency, while at the same time respects issue preclusion principles," id. at 453, and concluded that there was an "adequate fit" between the "one element" standard "and the finality and efficiency policies it is designed to serve." Id. at 454. As a result, the Eighth Circuit joined the Third and Fourth in expressly adopting the Director's standard.[12]

---

[12]The Sixth Circuit, too, has adopted the Director's "one element" test, although it appears to have applied a modified version of the test. In Sharondale, the Sixth Circuit first

23

Because the Director's interpretation of the agency's own regulation is

---

observed that it was <u>Chevron</u>-bound to defer to the Director's construction of the regulation unless it was unreasonable.  42 F.3d at 998.  The court also recognized that when a miner filed a second claim more than a year after the first, the <u>res judicata</u> effect of the first claim may not be implicated, because the miner's physical condition may be substantially different, given the progressive nature of pneumoconiosis.  <u>Id.</u>

After offering these observations in <u>Sharondale</u>, the Sixth Circuit adopted the Director's "one element" test, but apparently grafted onto it a further requirement, when it remanded the case to the ALJ for a "material change" finding:

> The ALJ never discusses how the later x-rays differ qualitatively from those submitted in 1985.  Thus, we are unable to discern on the record before us whether the ALJ merely disagreed with the previous characterization of the strength of the evidence or whether [the claimant] indeed had shown the existence of a material change in his condition since the earlier denial.

<u>Id.</u> at 999 (footnote omitted).  Although the <u>Sharondale</u> court expressly adopted the "one element" test, the Sixth Circuit appears to have required more than simply establishing one element that was previously adjudicated against the claimant.  Specifically, <u>Sharondale</u> appeared to require a coal miner to make the further showing of actual change in that element, by conducting a comparison of the evidence between the earlier and later claims on the element in question.  Both the Fourth and Eighth Circuits have rejected the additional requirement that the <u>Sharondale</u> decision appears to have imposed.  <u>See</u> <u>Lisa Lee Mines</u>, 86 F.3d at 1363 n.11 ("We do not endorse, however, the closing paragraph of <u>Sharondale Corp.</u>, 42 F.3d at 999, where, after adopting the Director's standard, the Sixth Circuit seems to have required consideration of the evidence behind the earlier denial to determine whether it 'differ[s] qualitatively' from the new evidence."); <u>Lovilia Coal Co.</u>, 109 F.3d at 454 n.7.

The precise contours of the additional showing required in the Sixth Circuit under <u>Sharondale</u> have given rise to some controversy, even within the Sixth Circuit.  In <u>Tennessee Consol. Coal Co. v. Kirk</u>, 264 F.3d 602, 608-10 (6th Cir. 2001), the Court followed <u>Sharondale</u> in requiring a comparison of the old and new medical data, in addition to the ordinary requirements of the "one element" test.  However, in <u>Grundy Mining Co. v. Flynn</u>, another panel of the Sixth Circuit acknowledged that the interpretation of <u>Sharondale</u> had caused some confusion.  353 F.3d 467, 478 & n.5 (6th Cir. 2003).  Two judges in <u>Grundy Mining</u> agreed that <u>Sharondale</u> required a comparison of old and new medical data on top of the basic requirements of the "one element" standard, but a third judge, concurring, suggested that the overall thrust of <u>Sharondale</u> was to adopt the traditional "one element" standard, with no requirement of an additional showing.  353 F.3d at 486 (Moore, J., concurring).  Regardless of the precise parameters of the standard used in the Sixth Circuit, it is clear that that Circuit has adopted -- at least in real measure -- the Director's "one element" standard.

24

neither plainly erroneous nor inconsistent with the regulation, we are obliged to approach it with deference and to join our sister circuits that have embraced the "one element" test. Moreover, the deference we accord the Director's interpretation is particularly appropriate because the rule makes sense. Since the "one element" standard only requires a miner to prove one element that was previously adjudicated against him, it does not require a miner to relitigate the denial of his first claim. In other words, the "one element" test does not compel a comparison of the evidence associated with the second claim with the evidence presented at the first claim; rather, it mandates a comparison of the second claim's evidence with the conclusions reached in the prior claim. Use of the "one element" test thus respects the finality of the decision rendered on the first claim, shielding that decision from the second guessing that hindsight inevitably invites.

Rather than simply accepting the conclusions reached on the first claim and assuming their correctness, the test urged by U.S. Steel would subject those conclusions to intense scrutiny and much second guessing. And the test would cause a miner to argue that the first denial was correct, even though he (obviously) maintained at the time of the first claim that he should not be denied benefits. Thus, for example, in Jones's case, while he argued in his initial claim that he was totally disabled by pneumoconiosis, he would apparently have to argue in the

25

second claim that he was really not so afflicted at the time of the first claim, but had only subsequently become so. By adopting the Director's "one element" standard, we avoid forcing a miner to take a position in his second claim that plainly contradicts the one he took in the first claim.

The Director also has elaborated on the obvious difficulties inherent in requiring a coal miner, in a second claim, to compare evidence from the first and second claims:

> Indeed, comparing evidence from the prior and current claims invites the parties to engage in an absurd brand of relitigation involving the old claim. Jones's claims illustrate this problem. Jones failed to prove he had pneumoconiosis in his first claim. In order to prove that his condition has changed with respect to this element of entitlement, Jones also would have to prove that he did not have pneumoconiosis when he previously applied for benefits. In effect, Jones would have to argue against his own entitlement in the prior claim to prove that his condition has changed since that claim. Similarly, U.S. Steel would have to argue that Jones did have pneumoconiosis when he originally applied for benefits to prove that the claimant's condition has not changed in the interim. Encouraging the parties to assert arguments that contradict the positions they took in the prior litigation distorts the legitimate operation of the estoppel doctrine.

Federal Respondent's Brief at 28-29 n.17.

In urging us to reject the Director's "one element" test, U.S. Steel nevertheless advocates adoption of a standard outlined by the Seventh Circuit in Sahara Coal Co. We are not persuaded for the reasons we have already explained.

26

Moreover, even the Seventh Circuit appears to have adopted -- at least in some measure -- the Director's "one element" standard. It is true that the Seventh Circuit initially required a miner making a duplicate claim to show that he "did not have black lung disease at the time of the first application but has since contracted it and become totally disabled by it, or that his disease has progressed to the point of becoming totally disabling although it was not at the time of the first application." Sahara Coal Co., 946 F.2d at 556. Since Sahara Coal, however, the Seventh Circuit appears to have moved from its earlier position that establishing material change requires a searching comparison of the old and new evidence and has approached some acceptance of the "one element" test.[13]

Because the Director's "one element" standard is both reasonable and consistent with § 725.309, and because using this test will eliminate unnecessary and costly collateral litigation, we adopt the agency's "one element" standard.

------

[13]In Peabody Coal, the Seventh Circuit, sitting en banc, described the "one element" test in these terms: "If by that the Director means that at least one element that might independently have supported a decision against the claimant has now been shown to be different (implying that the earlier denial was correct), then we would agree that the 'one element' test is the correct one." 117 F.3d at 1009. In a more recent case, Midland Coal Co. v. Director, OWCP, 358 F.3d 486 (7th Cir. 2004), a panel of the Seventh Circuit referring to Peabody Coal concluded that "an en banc decision of this court had . . . squarely [held] that traditional principles of res judicata do not bar a subsequent application for black lung benefits where a miner demonstrates a material change in at least one of the conditions of entitlement." Id. at 489.

The Peabody Coal and Midland Coal decisions suggest that the Seventh Circuit may have moved away from the test articulated in Sahara Coal and toward adoption of a modified form of the "one element" test.

27

This standard establishes a simple and uniform approach to material change determinations, protects the integrity of the first denial from the distant, searching eyes of hindsight, and respects the principles of res judicata. The Director's standard gives full credit to the finality of the original denial, but plainly recognizes that pneumoconiosis is a latent and progressive disease, and that a miner's condition can change over time. See 20 C.F.R. § 718.201(c) (stating that pneumoconiosis "is recognized as a latent and progressive disease which may first become detectable only after the cessation of coal mine dust exposure"); see also Coleman, 345 F.3d at 863 ("Because pneumoconiosis is a latent and progressive disease, a miner's condition may worsen over time."); Lovilia Coal Co., 109 F.3d at 450 (same); Lisa Lee Mines, 86 F.3d at 1364 (same); Swarrow, 72 F.3d at 314 ("[P]neumoconiosis is a latent dust disease. . . . Congress, in enacting the BLBA, recognized the perniciously progressive nature of the disease." (citations omitted)).

After thorough review of the record, we also conclude that the ALJ properly applied the "one element" test to the Jones case. The ALJ correctly determined that all four elements were resolved against Jones in the denial of his 1997 claim, and then concluded that Jones established a material change in conditions proving, by a preponderance of the medical evidence, that he suffered from

pneumoconiosis at the time of the second, duplicate claim. See ALJ Order at 8. In short, the ALJ correctly determined that Jones had satisfied the threshold requirement for a duplicate claim embodied in 20 C.F.R. § 725.309 by showing a material change in condition, and, then, properly examined whether Jones satisfied the other requirements.

## III.

U.S. Steel also argues that the ALJ's substantive (merits) determination -- that Jones was in fact eligible for benefits -- was wrong. It says that the ALJ erred in this case by failing to weigh all of the relevant medical evidence, and that the ALJ's determinations were neither supported by the evidence nor consistent with the law. We remain unpersuaded.

First, U.S. Steel claims that the ALJ erred by failing to properly weigh all of the medical evidence together in determining whether a preponderance of the evidence supported a finding of pneumoconiosis. U.S. Steel urges this Court to adopt the reasoning of the Fourth Circuit in Island Creek Coal Co. v. Compton, 211 F.3d 203 (4th Cir. 2000). In Compton, the court concluded that an adjudicator was obliged to weigh, in concert, all of the medical evidence pertaining to the disease, rather than evaluating separately each category of evidence. See id. at 208-09. Thus, the Fourth Circuit concluded that the ALJ in Compton erred by

29

failing to weigh x-ray and medical opinion evidence <u>together</u> -- instead, looking at each form of evidence alone -- and remanded to the ALJ to do so.  <u>Id.</u> at 211.

While <u>Compton</u> is not binding authority, even if it were, U.S. Steel's argument would still fail.  In the portion of his decision labeled "Pneumoconiosis," the ALJ stated that "[c]hest x-ray and physician opinion evidence are the means available to Claimant to prove the existence of pneumoconiosis.  § 718.202(a)."  <u>ALJ Order</u> at 3.  The ALJ then went on to review <u>all</u> of the x-ray evidence, as well as all of the medical opinion evidence.  After weighing the two forms of evidence, in concert, the ALJ credited some opinions and rejected others:

> I find the opinions of occupational/preventative medicine specialist Dr. Marder and Claimant's treating physician Dr. Askew the most persuasive.  The report of board-certified pulmonary specialist Dr. Cohen supports their conclusions.  I find that Claimant has met his burden of proof.  Claimant has proved, by the preponderance of the new physician evidence, the existence of pneumoconiosis at § 718.202(a)(4).

> I find physician opinion evidence at § 718.202(a)(4) a more probative basis to prove the existence of pneumoconiosis then [sic] chest x-ray evidence at § 718.202(a)(1).  Chest x-ray evidence is one type of isolated evidence whereas physician opinion evidence takes into consideration a totality of factors including evidence of impairment and exposures relevant to the broader definition of pneumoconiosis at § 718.201.

30

ALJ Order at 7-8.  Again, before finding that Jones suffered from pneumoconiosis, the ALJ considered both the x-ray evidence and the physician opinion evidence. Simply put, the ALJ did not fail to weigh the x-ray evidence along with the medical opinion evidence.

U.S. Steel also says that the ALJ committed reversible error by finding that Jones actually suffers from pneumoconiosis.  It claims that the greater weight of the relevant medical evidence does not establish pneumoconiosis.  As a preliminary matter, we repeat the deferential standard of review we apply to the ALJ's findings.  As an appellate court we will not conduct a de novo review of all the medical evidence, but instead approach the ALJ's findings with deference.  We reverse only if the findings are contrary to law or unsupported by substantial evidence when viewing the record as a whole.  Lollar, 893 F.2d at 1261-62.  While U.S. Steel, in essence, urges this Court to undertake a plenary review of all the medical evidence and to reach our own conclusion -- one notably different from the determination  made by the ALJ -- it is inappropriate for us to do so.  Our task is to assess whether the ALJ's findings were supported by substantial evidence, and if they were, we are obliged to affirm.

Our review of the record shows substantial evidence in support of the conclusion that Jones suffers from pneumoconiosis.  Drs. Marder, Askew and

Cohen all opined that Jones was afflicted by the ailment, after carefully studying the x-ray evidence and the pulmonary restriction based on various pulmonary and lung-capacity tests.  Based on Jones's work history and his history of not smoking, medical studies of coal-dust induced disease, and the test results, Drs. Marder, Askew and Cohen all concluded that Jones's pulmonary restriction was a result of pneumoconiosis.  The ALJ found the opinions of Drs. Marder, Askew and Cohen to be well reasoned and credible, and accorded them more weight than the opinions of Dr. Fino and Dr. Goldstein.  We cannot second guess the credibility determinations made by the trial court unless they were unsupported by substantial evidence.  See Jordan v. Benefits Review Bd. of the U.S. Dep't of Labor, 876 F.2d 1455, 1460 (11th Cir. 1989) ("The question of whether the medical report is sufficiently documented and reasoned is one of credibility for the fact finder."); Taylor v. Ala. By-Products Corp., 862 F.2d 1529, 1531 n.1 (11th Cir. 1989) (per curiam) ("We do not question the weight accorded to the evidence by the ALJ, for such is not within our scope of review.").  And the opinions of Drs. Marder, Askew and Cohen  were amply supported in the record.  Taken as a whole, they provide a sufficient evidential foundation for the ALJ's conclusion.[14]

---

[14]Moreover, as the ALJ noted, under 20 C.F.R. § 718.203(b), a miner with pneumonoconiosis who has worked for 10 or more years in coal mines is entitled to a rebuttable presumption that his pneumoconiosis arose from coal mine employment.  There is substantial

Finally, U.S. Steel argues that the ALJ erred by finding that Jones was totally disabled and that pneumoconiosis was a "substantial contributing factor." Here again, we decline petitioner's invitation to conduct a plenary or de novo review of the evidence; our job is to measure whether substantial evidence supports the ALJ's findings that Jones was totally disabled and that pneumoconiosis was a substantial contributing factor.

There was substantial (indeed, the same) evidence to support the ALJ's determinations. The medical opinions of Drs. Marder, Askew and Cohen uniformly concluded that Jones was totally disabled after considering the results of Jones's pulmonary function tests and his other medical records. These doctors concluded that, given the restrictions in Jones's lung functioning capacity, he could no longer perform the rigorous and strenuous work associated with the job of a faceman in the coal mines of Alabama. These doctors were entitled to opine about the extent of Jones's disability by comparing his condition with the requirements of his last mine job. Indeed, a panel of this Court has held that total disability in black lung cases must be decided on a case-by-case basis and by comparing the miner's pulmonary limitations to the specific exertional demands of

---

evidence on this record to support the ALJ's conclusion that U.S. Steel failed to rebut the presumption that Jones's pneumoconiosis arose out of his coal mine employment. See ALJ Order at 8.

his last job.  Jim Walter Res. v. Allen, 995 F.2d 1027, 1029 (11th Cir. 1993) (per

curiam) (citing Brown v. Cedar Coal Co., 8 BLR 1-86, 1-88 (1985) ("The

determination of what is a claimant's usual coal mine employment is made on a

case by case basis and will vary depending on the facts in each case."); Shortridge,

4 BLR at 1-534, 1-539 (". . . usual coal mine work is the most recent job the miner

performed regularly and over a substantial period of time")).[15]

U.S. Steel has further refined its argument, suggesting that we should

reverse because the ALJ also erred in determining that pneumoconiosis

contributed to Jones's disability.  We are unconvinced.  The issue of disability

causation is governed by 20 C.F.R. § 718.204(c)(1), which provides, in pertinent

part:

> A miner shall be considered totally disabled due to pneumoconiosis if
> pneumoconiosis, as defined in § 718.201, is a <u>substantially
> contributing cause</u> of the miner's totally disabling respiratory or
> pulmonary impairment.  Pneumoconiosis is a 'substantially
> contributing cause' of the miner's disability if it has a material
> adverse effect on the miner's respiratory or pulmonary condition . . . .

20 C.F.R. § 718.204(c)(1) (emphasis added).  As the Department of Labor has

observed, "evidence that pneumoconiosis makes only a negligible,

---

[15]Even Drs. Goldstein and Fino, who opined that Jones did not suffer from
pneumoconiosis, concluded that he was totally disabled.  These doctors did suggest that Jones's
disability may have been caused by Jones's other medical conditions, but as to the extent of the
disability, their opinions provide additional support for the ALJ's findings.

inconsequential, or insignificant contribution to the miner's total disability is insufficient to establish that pneumoconiosis is a substantially contributing cause of that disability." 65 Fed. Reg. 79,946 (Dec. 20, 2000) (emphasis added). We, too, have recognized that disability causation should be measured against a "substantially contributing cause" standard. See Lollar, 893 F.2d at 1265 (disability causation can be proved if claimant "establish[es] that his pneumoconiosis was a substantial contributing factor in the causation of his total pulmonary disability" (emphasis added)); see also Black Diamond Coal, 95 F.3d at 1084.

The ALJ applied the proper causation standard, explaining that "Claimaint must prove that pneumoconiosis is a substantially contributing cause of his totally disabling [condition]." ALJ Order at 9 (emphasis added). The ALJ then concluded that the pneumoconiosis caused by "coal mine dust exposure" had "a material adverse effect on, or more than a negligible, inconsequential, or insignificant contribution to, Claimant's respiratory or pulmonary condition." Id. (emphasis added). Substantial medical evidence -- including the opinions of Drs. Marder, Askew and Cohen -- supports the ALJ's conclusion on causation too. Simply put, the ALJ used the right standard on causation and drew a conclusion substantially supported by the record evidence.

35

Accordingly, we adopt the Director's "one element" test for establishing a

material change in conditions, and AFFIRM in all respects the judgment of the

BRB affirming the award of benefits to this coal miner.

**AFFIRMED**.