Filed: July 16, 1996

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

No. 94-2523
(92-338-BLA)

---

Lisa Lee Mines (Terrilynne Coal Company),

Petitioner,

versus

Director, Office of Workers' Compensation
Programs, etc., et al,

Respondents.

---

O R D E R

---

The Court amends its opinion filed June 19, 1996, as follows:

On the cover sheet, section 6 -- the section is corrected to read: "Affirmed by published opinion. Judge Hall wrote the majority opinion, in which Judges Widener, Murnaghan, Ervin, Niemeyer, Michael, and Motz joined. Judge Niemeyer wrote a concurring opinion. Judge Luttig wrote a dissenting opinion, in which Chief Judge Wilkinson and Judges Russell, Wilkins, Hamilton, and Williams joined."

For the Court - By Direction

/s/ Bert M. Montague

Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

LISA LEE MINES (TERRILYNNE COAL
COMPANY),
Petitioner,

v.

No. 94-2523

DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR; ALVA
RUTTER,
Respondents.

On Petition for Review of an Order
of the Benefits Review Board.
(92-338-BLA)

Argued: January 30, 1996

Decided: June 19, 1996

Before WILKINSON, Chief Judge, and RUSSELL, WIDENER,
HALL, MURNAGHAN, ERVIN, WILKINS, NIEMEYER,
HAMILTON, LUTTIG, WILLIAMS, MICHAEL, and MOTZ,
Circuit Judges.

_____

Affirmed by published opinion. Judge Hall wrote the majority opin-
ion, in which Judges Widener, Murnaghan, Ervin, Niemeyer, Michael,
and Motz joined. Judge Niemeyer wrote a concurring opinion.  Judge
Luttig wrote a dissenting opinion, in which Judges Wilkinson,
Russell, Wilkins, Hamilton, and Williams joined.

_____

COUNSEL

**ARGUED:** Ronald Eugene Gilbertson, KILCULLEN, WILSON & KILCULLEN, CHARTERED, Washington, D.C., for Petitioner. Christian P. Barber, Counsel for Appellate Litigation, Office of the Solicitor, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent Director; Robert F. Cohen, Jr., COHEN, ABATE & COHEN, Fairmont, West Virginia, for Respondent Rutter. **ON BRIEF:** Thomas S. Williamson, Jr., Solicitor of Labor, Donald S. Shire, Associate Solicitor for Black Lung Benefits, Karen N. Blank, Office of the Solicitor, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent Director.

_____

OPINION

HALL, Circuit Judge:

Lisa Lee Mines petitioned for review of an order of the Department of Labor's Benefits Review Board (BRB) affirming the award of black lung benefits to Alva Rutter, a former coal miner. A panel of this court reversed and remanded. Lisa Lee Mines v. Director, Office of Workers' Compensation Programs, 57 F.3d 402 (4th Cir. 1995). Rutter, who had proceeded pro se before the panel, obtained counsel and sought rehearing en banc. Having granted such rehearing, we now affirm.

I.

Putting aside for a moment the question on which the parties disagree, we must first note that Alva Rutter's medical condition unquestionably qualifies him for black lung benefits. He is the very paradigm of the man Congress intended to compensate. According to x-rays taken in 1988 and 1989, he has profuse[1] small opacities in all six lung

_____

[1] One reader classified the profusion as 2/3 and the other as 3/2. There are twelve levels of profusion classification for the radiographic interpretation of simple pneumoconiosis. 2/3 is the fourth highest profusion and 3/2 the third. See N. LeRoy Lapp, "A Lawyer's Medical Guide to Black Lung Litigation," 83 W. Va. Law Rev. 721, 729-731 (1981).

zones, upon which has developed complicated pneumoconiosis, or, by its more dauntingly descriptive name, "progressive massive fibrosis." One of the 1989 readers classified the large opacities in Rutter's lungs in Category B, which means that they are greater than two inches in diameter. Because progressive massive fibrosis is just that -- progressive -- Rutter is doubtless worse off now, seven years later, and he is not yet an old man.[2] He spent his entire working life -- 32 years -- in the mines, most of it loading coal by hand. Because of this long tenure, he need prove nothing more than his complicated pneumoconiosis to be entitled to benefits. 30 U.S.C. § 921(c)(1), (3); 20 C.F.R. §§ 718.302, .304. In short, the substance of Rutter's claim is fine.

II.

Procedure is the rub. In 1986, without the assistance of an attorney, Rutter applied for black lung benefits. He was still working at the time. An x-ray he submitted showed complicated pneumoconiosis; nonetheless, a Department of Labor claims examiner sent him a form denial. Rutter did not pursue the claim further.

In April 1989, he filed a new claim.[3] Because of the denial of his earlier claim, this one was subject to the "duplicate claims" regulation at 20 C.F.R. § 725.309(d), which states, in relevant part:

> If the earlier miner's claim has been finally denied, the later claim shall also be denied, on the grounds of the prior denial, unless the deputy commissioner determines that there has been a material change in conditions . . ..

This time a deputy commissioner[4] in the Department awarded benefits. The responsible operator, petitioner Lisa Lee Mines, requested a hearing. Lisa Lee's challenge to the deputy commissioner's decision

---

[2] Rutter was born June 5, 1936. At the time of his 1989 claim application, he had five minor dependent children living at home.

[3] Rutter was still working as a miner helper at the time, though, the very next month, his breathing problems led to a transfer to less arduous toil. He retired in January 1990.

[4] "Deputy commissioners" are now referred to as "district directors." 20 C.F.R. § 725.101(a)(11) (1995).

3

was limited to whether Rutter had made the threshold showing of a "material change in conditions." The parties then agreed to submit the question on the existing record.

On October 11, 1991, an administrative law judge (ALJ) issued a decision and order awarding benefits. After canvassing the evidence, the ALJ concluded, "the medical evidence in 1989 shows a definite progression of the disease occurring over another interval of time resulting in the Claimant's reduced capacity to do his former coal mine work."

The ALJ then went on to hold that, if the evidence were inadequate to establish a material change in conditions, Rutter would still be entitled to benefits. According to the ALJ, the 1986 denial was erroneous on its face and "null and void ab initio." Consequently, "it is believed that a determination whether or not the new evidence establishes a change of condition is immaterial." The ALJ set the date of onset of disability as August 1, 1986.

On September 30, 1994, the BRB modified the award. It held that the ALJ's finding of an actual progression of Rutter's disease was sufficient to satisfy its Spese[5] test for material change in condition. However, the BRB held that the ALJ had no power to reopen or review the denial of the 1986 claim, which became final upon Rutter's failure to appeal or move to modify it. The BRB therefore affirmed the award but changed the date from which benefits were payable to April 1, 1989. Lisa Lee then filed a timely petition for review in this court.

III.

Lisa Lee's argument is as easily stated as it is counterintuitive: Rutter must now lose because he clearly should have won in 1986. He likely should have; the ALJ here was so appalled by the 1986 denial that he deemed it "void ab initio." Nonetheless, though we might

_____

[5] Spese v. Peabody Coal Co., 11 BLR 1-174, 1-176 (Ben. Rev. Bd. 1988) (change in conditions is established by evidence that is "relevant and probative so that there is a reasonable possibility that [it] would change the prior administrative result.").

share the ALJ's sentiment, we agree that his reasoning was flawed. The 1986 denial is final, see Pittston Coal Group v. Sebben, 488 U.S. 105, 122-123 (1988), and for present purposes, we must assume that it was correct.

The panel rejected the BRB and Director's standards for determining whether there was a material change in Rutter's condition. The panel criticized the BRB's Spese standard because it "impermissibly allows a claimant to present . . . evidence available at the time of the initial decision tending to show that the initial decision was in error." 57 F.3d at 406. The Director's standard met similar criticism: "it permits reconsideration of critical determinations underlying a decision denying benefits." Id. at 407. Instead, the panel adopted the Seventh Circuit's test, which, as applied, meant that the miner must show that his condition has changed on every element previously decided against him. See Sahara Coal Co. v. Director, OWCP, 946 F.2d 554 (7th Cir. 1991). Moreover, as in Sahara Coal, the panel required inquiry into the evidence behind the earlier decision, rather than merely accepting the factual predicate of the earlier decision as correct. Consequently, the panel remanded for an all-but-certain finding that Rutter had actually been eligible for benefits in 1986, so his current conceded eligibility could not evince a material change in condition. We disagree with this reasoning.

If the 1986 denial is "final" in a legal sense, we must accept the correctness of its legal conclusion -- Rutter was not eligible for benefits at that time -- and that determination is as off-limits to criticism by the respondent as by the claimant. Only by repudiating the 1986 judgment and its necessary factual underpinning can no change in Rutter's condition be found. We believe that such repudiation is improper.

Accepting the correctness of a final judgment is more than legalistic tunnel vision; it is a practical -- perhaps the only practical -- way to discern a concrete form in the mists of the past. The ease we might feel at second-guessing this final judgment ought not tempt us to overestimate our retrospective perspicacity; most black lung claims involve a mixed bag of test results and wildly divergent medical opinions. The final decision of the ALJ (or BRB or claims examiner) on the spot is the best evidence of the truth at the time.

5

In this regard, the panel opinion could be read to imply that the deputy commissioner made an express finding of fact in 1986 that Rutter had complicated pneumoconiosis. See 57 F.3d at 404 ("A Department of Labor deputy commissioner denied that claim, <u>finding that although Rutter had presented evidence of complicated pneumoconiosis</u>, he had not established that the disease was caused by coal mine work, or that he was totally disabled by the disease.") (emphasis added). This implication is mistaken. The form denial neither states that Rutter has complicated pneumoconiosis nor acknowledges that he "had presented evidence" of it. It may have been obvious to all who could and would see, but a finding that should have been made is not a finding that <u>was</u> made.**6**

Not only does the denial of benefits itself necessarily imply the opposite finding, <u>see</u> 20 C.F.R. §§ 718.302 and .304, but the language of the summary denial form can logically lead only to that finding. In one part of the correspondence, Rutter was told that he had not proved total disability; in another, he was invited to submit additional evidence on that issue, and was told that proof of complicated pneumoconiosis would suffice.**7**

_____

**6** We can only speculate that Rutter would have had the 1986 denial reversed on appeal to an ALJ, the BRB, or this court. For all we can know, had Rutter requested a hearing, the respondent would have produced a dozen radiologists to deny that his x-rays were positive for complicated pneumoconiosis.

Moreover, it is at least conceivable that the claims examiner consciously rejected the x-ray evidence of complicated pneumoconiosis as inconsistent with Rutter's "essentially normal" pulmonary function tests.

**7** The denial of benefits was accomplished through Department of Labor form letter No. CM-1000a (Jan. 1982) and its "Guide for Submitting Additional Evidence," No. CM-1000g (Jan. 1982). The letter states, as pertinent here:

> Dear Claimant:
>
> We have carefully reviewed the evidence in your claim under the Black Lung Benefits Act. This evidence does not show that you qualify for black lung benefits.
>
> * * *

We accept the final 1986 decision, as well as its necessary factual predicate, as correct. Rutter has shown a stark change in condition, and he is entitled to have his 1989 claim decided on its own considerable merits.

IV.

A.

Rutter's is just a single case, and our reasons for affirming the award could end here. However, the proper standard to determine whether a given claimant has proved a "material change in condition" has recently split the circuits, and we now take this opportunity to align ourselves with the Third and Sixth Circuits, rather than the Seventh.

In choosing the proper standard, we have three candidates: (1) the BRB's Spese formulation, which broadly looks to whether the newly submitted evidence favorable to the claim has a "reasonable possibility" of changing the prior result; (2) the Sahara Coal test, adopted by the Seventh Circuit and the panel here, which requires the miner to

_____

> You do not qualify for benefits because the evidence in your claim
>
> * * *
>
> 2. (X) does not show that the disease was caused at least in part by coal mine work; [and]
>
> 3. (X) does not show you are totally disabled by the disease. Totally disabled means you are unable to perform the type of work required by your coal mine work because of a breathing impairment caused by pneumoconiosis (black lung disease). The results of your medical evidence are shown on the enclosed explanation.

The guide for submitting additional evidence directed Rutter to submit proof of total disability due to pneumoconiosis. Five types of such proof were listed; the very first was "X-ray or other evidence confirming the presence of complicated pneumoconiosis (the most severe form of black lung disease)[.]"

7

show that he "did not have black lung disease at the time of the first application but has since contracted it and become totally disabled by it, or that his disease has progressed to the point of becoming totally disabling although it was not at the time of the first application," 946 F.2d at 556; and (3) the Director's "one-element" standard, which requires the claimant to prove, under all of the probative medical evidence of his condition after the prior denial, at least one of the elements previously adjudicated against him. The Director's standard, to which we owe deference,**8** is easily the most reasonable and workable of the lot. To explain why, we should begin with background principles.

B.

A new black lung claim is not barred, as a matter of ordinary res judicata, by an earlier denial, because the claims are not the same. The health of a human being is not susceptible to once-in-a-lifetime adjudication.

> It is almost too obvious for comment that res judicata does not apply if the issue is claimant's physical condition or degree of disability at two entirely different times, particularly in the case of occupational diseases.

3 A. Larson, The Law of Workmen's Compensation , § 79.72(f) (1989). The issue in 1986 was Rutter's condition in 1986, and his future condition was not and could not have been litigated then.

Thus, nothing bars or should bar claimants from filing claims seriatim, and the regulations recognize that many will. See, e.g., 20 C.F.R. § 725.409(b) (if prior claim has been denied by reason of abandonment, "a new claim may be filed at any time and new evidence submitted where [the claims modification process is unavailable.]") The duplicate claims regulation, 20 C.F.R. § 725.309(d), does not bar new claims, but rather directs that they shall be denied based on the earlier denial absent a threshold showing of a material change

_____

**8** Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 696 (1991); see generally, Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 845 (1984).

8

in conditions. Thus, the regulation simply interposes a rebuttable presumption that nothing has changed, apparently to lessen the administrative burden of the black lung program.**9** It creates a sort of presumptive finality operating upon a future dispute, a finality that must not be confused with ordinary res judicata, which cannot look forward.

The Sahara Coal test, as applied by the panel here, forces the claimant to show a material change on every element that was previously decided against him.**10** This approach fails to account for the frailty of alternative holdings. A black lung claimant must prove every element of his claim. If he loses on one, or two, or three elements, the end result is the same: a denial. For this reason, if he loses on more than one element, but only one is in fact a correct basis for denial, the law does not impose a duty upon him to file a meaningless appeal to "correct" the erroneous alternative holdings. Otherwise, "the rule might be responsible for increasing the burdens of litigation on the parties and the courts rather than lightening them." Restatement (Second) of Judgments § 27, comment i. (1982). Accordingly, holdings in the alternative, "either of which independently would be sufficient to support the result, . . . [are] not conclusive with respect to either issue standing alone." Id.

Here we meet up with something of a dilemma. We must have an anchor in the past with which to compare current conditions, but alternative holdings are not necessarily conclusive.

_____

**9** Lisa Lee correctly notes that there is no express statutory basis for the duplicate claims regulation, and asserts that it is invalid. The premise of this argument is that, absent the regulation, miners could not file new claims. But of course they could; as the excerpt from Larson's treatise quoted above makes clear, common-law res judicata has no applicability where the issue is a person's health at two different times.

**10** If, as we have held above, the necessary factual premises of the 1986 decision must be accepted as true, Rutter would win under any standard. Because of statutory presumptions, see supra at 3, proof of complicated pneumoconiosis, in and of itself, establishes "all elements" of Rutter's claim.

9

The Director's approach strikes a reasonable balance. Each of the alternative holdings is presumed to have been correct when made and to continue to be correct through time. Because of their tenuous nature, however, disproof of the continuing validity of just one of the alternative holdings is enough to establish a material change in condition. We defer to the Director's reasonable interpretation of the duplicate claims regulation. In doing so, we join the Third and Sixth Circuits. Labelle Processing Co. v. Swarrow, 72 F.3d 308 (3rd Cir. 1995); Sharondale Corp. v. Ross, 42 F.3d 993 (6th Cir. 1994).**11**

C.

In comparison to the Director's approach, Spese and Sahara Coal come up short. The Spese test is too vague to be applied consistently, contains illogical evidentiary rules (it permits resort to evidence available before the prior denial and forbids consideration of contrary probative evidence), and arguably sets too low a threshold ("reasonable possibility") to discern "material" changes in condition.

Sahara Coal has two flaws. First, it founders on issue-preclusion principles where there are alternative holdings in the first claim, as discussed above. Second, and more importantly, it is the only one of the standards that permits -- in fact demands -- a plenary review of the evidence behind the first claim. For example, it is not enough for the miner to rely on an ALJ's final determination that he did not have pneumoconiosis or was not disabled by it. The miner must affirmatively prove that these adverse determinations were correct.**12** To use

_____

**11** We do not endorse, however, the closing paragraph of Sharondale Corp., 42 F.3d at 999, where, after adopting the Director's standard, the Sixth Circuit seems to have required consideration of the evidence behind the earlier denial to determine whether it "differ[s] qualitatively" from the new evidence. Even if we agreed with such a requirement, Rutter certainly satisfied it here, inasmuch as the ALJ found an actual deterioration in his condition.

**12** The Seventh Circuit did speculate that this rule might allow for an exception if the claimant's current condition were "substantially worse," lest the possibility of his prior entitlement "complicate the proceeding unduly." 946 F.2d at 558. Where the claimant is only "slightly worse off," however, he must prove that he correctly (and slightly) missed the disability threshold the first time around. Id. This requirement lends itself to evidentiary mischief, inasmuch as the prior file will generally contain "admissions" by the miner of all of the elements of entitlement.

10

that court's own words, its standard "makes mincemeat of res judi-cata." 946 F.2d at 556.

V.

We are not unmindful of the possibility that the Director's standard might encourage abuse of the administrative process by wily claim-ants and their wily lawyers. After today's decision, an unsuccessful claimant will doubtless schedule a morning appointment with a com-pliant physician for a year and a day after the denial of his claim. Armed with evidence contrary to an element previously found against him, the claimant will file a new claim that afternoon, and so on, ad infinitum.

This scenario belongs to that genre of horribles that seems impres-sive in academic debate but has little relevance to real life. Any claimant who wants to be a perpetual litigator can already be a perpet-ual litigator, and in a much easier fashion. The day before his hypo-thetical doctor's appointment, the miner may file a request for "modification" of the earlier denial. For the claimant, modification is a far more attractive option than a new claim, because, in addition to a change in conditions, it can be based on a "mistake in a determina-tion of fact" in the original denial. 20 C.F.R. § 725.310(a). No new evidence is required. A claims examiner may "`correct mistakes of fact, whether demonstrated by wholly new evidence, cumulative evi-dence, or merely further reflection on the evidence initially submit-ted.'" Jessee v. Director, OWCP, 5 F.3d 723, 724 (4th Cir. 1993) (quoting O'Keeffe v. Aerojet-General Shipyards, Inc., 404 U.S. 254, 256 (1971) (per curiam) (decided under Longshore and Harbor Work-ers' Compensation Act)). Because the § 725.310(a) procedure modifies the original denial, the claimant has the opportunity to col-lect benefits from an onset of disability date preceding the original denial. The miner who waits a year and a day must file a brand new claim, and, as we have stated above, the prior denial becomes a final adjudication that the miner was not disabled by pneumoconiosis as of the date of its issuance.

Moreover, a miner who wanted to file duplicate claims ad infini-tum would have to live ad infinitum. The black lung claims process is extraordinarily slow; today, in 1996, we still routinely hear cases

11

involving the 20 C.F.R. § 727.203 interim presumption, which was superseded by the permanent regulations <u>sixteen</u> years ago. <u>See</u> 20 C.F.R. § 718.2 (permanent regulations effective March 31, 1980). Few miners have the time or wherewithal to go through the system twice; all too many die during the first run.**13**

The risk of sporadic abuse of the duplicate claims process is far outweighed by the necessity that there be some such process and by the utility of the Director's approach to it. As we emphasized above, pneumoconiosis -- especially in the advanced form from which this claimant suffers -- is a progressive disease, and no rational system of law or of medicine could stand on the proposition that it can or must be measured only once.**14** A rational system would simulta-neously account for the progressiveness of the disease, discourage useless appeals of alternative holdings, and require, at the threshold, a palpable basis to believe that conditions have changed over time. The Director's "one-element" approach accomplishes this difficult task.

VI.

Finally, we return to Mr. Alva Rutter. In clinical terms, the change in his condition has been very real, even if we reexamine the 1986

_____

**13** Of course, an especially cagey claimant could abuse the system by simply dropping each claim after its administrative denial, filing anew in a year and a day, and waiting, as if for the lottery jackpot, to strike it rich with a sympathetic claims examiner.

This elaborate ploy could happen; all sorts of odd things happen. But it simply does not describe typical human behavior. Our lottery winner, for all the skill of his gambit, would quickly find himself faced with a controversion of the claim from the responsible operator, and he would then get a much belated chance at his decade of litigation. Out-of-work coal miners, disabled or not, generally need money badly enough to forgo such pointless intrigue in favor of honestly and earnestly prosecut-ing their claims.

**14** Accepting this proposition would put the miner in an absurd dilemma. Should he file now, and risk losing everything by filing a bit "too soon," or should he wait a few years until his disease has progressed to a more "favorable" stage?

12

evidence. The ALJ found that, in 1986, Rutter had small opacities of 2/2 profusion in four of six lung zones, with large opacities of category A (greater than one but less than five centimeters in diameter). By 1989, small opacities clogged all six lung zones, in greater profusion (2/3 to 3/2), and large opacities had progressed to Category B (greater than five centimeters). In 1986, notwithstanding his advanced disease, Rutter could work and support his family. Now he cannot. From Rutter's viewpoint, the change in his condition could scarcely be more "material."

The award of benefits is affirmed.

AFFIRMED

NIEMEYER, Circuit Judge, concurring:

I join in Judge Hall's opinion for the court but write separately to explain that my vote does not rest on the assumptions that the dissent attributes to the majority opinion.

The effect of the majority opinion is to award benefits to a person who indisputably falls within the class of persons that Congress intended to benefit. While a review of the record from the claimant's first application for benefits may call the original denial of benefits into question, established and desirable principles of finality bind us to accept that conclusion. On the claimant's reapplication for benefits some years later, the objective medical facts demonstrate that his condition worsened, to the point that the Department of Labor concluded, without difficulty, that the claimant was disabled. The change, defined by the later finding of disability when previously such a finding was not made combined with the finding of a worsened condition, is material. And it is that material change that demands my vote in favor of affirming the Department's award of benefits, but only from the date of the second benefits application.

I depart from the dissenting opinion where it draws the conclusion, contrary to the law of the case, that the claimant was "unquestionably disabled" at the time of his first application. To reach that conclusion, the dissent engages in an improper review of the first decision denying benefits, a decision the majority has left at rest.

13

Contrary to the dissent's suggestion, sympathy--other than for what the law prescribes--played no role in our disposition of this case.

LUTTIG, Circuit Judge, dissenting:

The majority today is tempted, and ultimately persuaded, by the sympathies of this case, as is evident from the fact that it begins its analysis by "[p]utting aside" the legal question before us, and instead, dwelling on the uncontroverted fact that the claimant today has complicated pneumoconiosis caused by coal mine work. Whether or not, in our judgment, Rutter has complicated pneumoconiosis, or whether he is someone to whom we would award benefits were it our responsibility, are not the questions before us, however. Rather, we have before us a question of law, whether this claimant has proven a "material change in conditions" that would warrant reconsideration of whether he is entitled to black lung benefits. See 20 C.F.R. § 725.309(d) (providing that a successive application for benefits "shall . . . be denied" unless there has been a "material change in conditions").

The Department of Labor promulgated section 725.309(d), the so-called duplicate claims provision, to allow miners who were not disabled at the time they were initially denied benefits an opportunity to establish their entitlement to benefits if they become totally disabled following a denial of benefits. As the Department itself described the regulation, "a miner whose claim has once been finally denied either by the Social Security Administration or the Department should be allowed to file a new claim on the grounds of a progression to total disability." See Discussion of Comments to Proposed Regulations on Duplicate Claims, 43 Fed. Reg. 36772, 36785 (Aug. 18, 1978) (emphasis added). The regulation was never intended to, nor does it, reach a person who was unquestionably disabled at the time of the initial denial, but erroneously held to be not disabled. The law provides avenues of relief -- neither of which this claimant pursued -- for a person who has been erroneously denied benefits. He may either appeal the erroneous decision, 20 C.F.R. § 725.410(c), or seek modification of that decision, for up to a year after the initial denial, id. at § 725.310. He is not, however, entitled to benefits under the duplicate claim provision.

14

In order to conclude that this claimant is entitled to benefits under the duplicate claims provision, the majority entirely relieves claimants of their burden of proving a material change in conditions, holding that any miner who is currently entitled to benefits shall receive them, a standard that invites claimants to file claim after claim until they find a pliant ALJ. As the majority unabashedly explains:

> [N]othing bars or should bar claimants from filing claims seriatim . . . .
>
> . . .
>
> After today's decision, an unsuccessful claimant will doubtless schedule a morning appointment with a compliant physician for a year and a day after the denial of his claim. Armed with evidence contrary to an element previously found against him, the claimant will file a new claim that afternoon, and so on, ad infinitum.

Ante at 8, 11. This is, of course, precisely the result intended to be avoided under the regulation. Like the now repudiated Spese standard, this standard fails even to examine or consider the claimant's original conditions, much less to require a determination of whether there has been a "material change" (or for that matter, even an immaterial change) in those conditions -- as the Director himself concedes. See Director's Answer in Support of Respondent's Petition for Rehearing En Banc at 9 (acknowledging that the "one-element" test "allows an inference of change" in conditions to support reexamination of a duplicate claim (emphasis added)). Indeed, in its haste to award benefits in this case, the majority does not so much as bother to differentiate between a change and a "material change," effectively holding that all changes are material.

That the majority's standard allows recovery of benefits merely upon a showing that the claimant is today eligible for benefits, without any evidence whatever of a change in his condition, is confirmed by the fact that the majority expressly rejects the requirement, from the Sixth Circuit's decision it purports to adopt, that the ALJ make certain that the evidence presented with the duplicate claim "`differ[s] qualitatively'" from the evidence available at the time of the initial

15

denial. See ante at 10 n.11 (quoting Sharondale Corp. v. Ross, 42 F.3d 993, 999 (6th Cir. 1994)). The majority, thus, adopts for this circuit the very rule that even the Sixth Circuit recognized was manifestly untenable under the regulation -- that the claimant may recover benefits if "the ALJ merely disagree[s] with the previous characterization of the strength of the evidence." Sharondale, 42 F.3d at 999.

When all is said and done, therefore, the majority holds that a claimant is entitled to benefits if he comes forward with any additional evidence of his condition "after" the denial of the original claim and shows that he is now entitled to benefits, ante at 8, whether or not the claimant proves a material change (or a change at all) in his conditions from what they were at the time he was earlier denied benefits. A claimant, for example, who is denied benefits and then files a duplicate claim accompanied by an additional "probative" x-ray taken after the initial denial that is identical to the x-rays presented with the initial claim (that is, that show identical opacities) would receive black lung benefits on his duplicate claim, notwithstanding that his condition has not changed at all. For, he has, according to the majority, "prove[d], under all of the probative medical evidence of his condition after the prior denial, at least one of the elements previously adjudicated against him." Ante at 8. Not only is such a holding irreconcilable with the plain language of section 725.309(d), it "makes mincemeat" of the doctrine of res judicata underlying section 725.309(d) by permitting the previous decision to be reevaluated, as the majority itself says, ad infinitum. Cf. Sahara, 946 F.2d at 556 (similar criticism of the Spese standard).

Because the standard articulated by the Seventh Circuit in Sahara Coal Co. v. OWCP, 946 F.2d 554, 556 (7th Cir. 1991), is the only standard which both requires a "material change in conditions" and respects the finality of the initial judgment, I would adopt that test as the law of this circuit. The Sahara standard provides that,

> [a] material change in conditions means either that the miner did not have black lung disease at the time of the first application but has since contracted it and become totally disabled by it, or that his disease has progressed to the point of becoming totally disabling although it was not at the time of the first application.

16

Id. Of the various tests for determining eligibility for duplicate claim benefits, only the Sahara standard focuses upon the miner's conditions and requires that those conditions change in a way that is material. The majority's characterization notwithstanding, the Sahara standard does not require that the claimant show a material change "on every element previously decided against him," ante at 5, 9. Rather, it requires only that the claimant show, through a comparison of the evidence existing at the time of his original denial of benefits and the evidence currently available, that he was not then, but is now, eligible for benefits. In other words, the focus of the Sahara standard is not on the conclusions reached as to the conditions, but rather on the underlying conditions themselves, which is exactly what section 725.309(d)'s plain language demands. In no other possible way can it be determined whether the claimant's conditions have materially changed since the earlier denial of benefits.

The majority is critical of the Sahara standard because it believes that any examination of the evidence underlying the prior denial of benefits (that is, examination of the evidence as to the miner's prior condition) would offend principles of res judicata. A standard that requires denial of a duplicate claim because the claimant's underlying conditions have not materially changed (for example, because the claimant was disabled then and is disabled now), however, does not undermine the original decision to deny benefits; rather, such a standard fully respects that decision, in stark contrast to the standard adopted by the majority, which continuously allows reopening of that original decision based upon evidence reflecting no change at all in the claimant's conditions. Instead of "foundering" on principles of res judicata and collateral estoppel, as the majority contends, the Sahara standard actually represents too strict an application of those principles for the majority, because that standard, unlike the majority's standard, does require faithful adherence to the initial denial, irrespective of whether that denial was correct or incorrect.

The court's tortured interpretation of the duplicate claims regulation comes about as a result of this one claimant's refusal either to appeal or to seek modification of an arguably erroneous decision and the court's unwillingness to accept the result that he may, as a consequence of his insouciance, find himself without remedy. As a court of law, however, we should recognize that this circumstance is an

17

extraordinarily unusual one, not likely to frequently, if ever, repeat itself, and resist the temptation to yield to our collective sense as to what would be "fair" in this most peculiar of circumstances. Doing so, and simply applying the plain language of the regulation, I would vacate and remand to the ALJ for reconsideration of whether Rutter, under the standard adopted by the Seventh Circuit in <u>Sahara</u>, has shown a "material change in conditions."

Chief Judge Wilkinson and Judges Russell, Wilkins, Hamilton and Williams join in this opinion.

18