*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0253p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

CUMBERLAND RIVER COAL COMPANY,
                                        *Petitioner*,

    *v.*

                             No. 11-3500

BILLIE BANKS; DIRECTOR, OFFICE OF
WORKERS' COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR,
                                        *Respondents*.

_____

On Petition for Review of an Order
of the Benefits Review Board.
No. 10-0410 BLA.

Decided and Filed: August 8, 2012

Before: SILER and WHITE, Circuit Judges; REEVES, District Judge.[*]

_____

## COUNSEL

**ON BRIEF:** Ronald E. Gilbertson, HUSCH BLACKWELL LLP, Washington, D.C., for Petitioner. Joseph E. Wolfe, Ryan C. Gilligan, WOLFE, WILLIAMS, RUTHERFORD & REYNOLDS, Norton, Virginia, Emily Goldberg-Kraft, Sean G. Bajkowski, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondents.

_____

## OPINION

_____

DANNY C. REEVES, District Judge. This case arises from a series of petitions for benefits under the federal Black Lung Benefits Act. After two unsuccessful attempts, Appellee Billie Banks filed a claim for benefits in 2003, presenting new evidence of pneumoconiosis. An administrative law judge (ALJ) found that Banks had established

_____

[*]The Honorable Danny C. Reeves, United States District Judge for the Eastern District of Kentucky, sitting by designation.

a change in his condition and that he suffered from legal pneumoconiosis which substantially contributed to his total disability.  Banks was awarded benefits and the Benefits Review Board affirmed.  Cumberland River Coal Company appeals this determination, arguing that Banks failed to establish a change in his condition under 20 C.F.R. § 725.309(d).  Additionally, it argues that Banks failed to establish that he suffers from pneumoconiosis or that he is disabled due to this impairment.  Having reviewed the record of this proceeding, we will affirm the judgment of the Benefits Review Board.  In reaching this decision, we adopt the regulatory interpretation urged by the Director of the Office of Workers' Compensation Programs.

## I.

Billie Banks worked as a coal miner for seventeen years.  He was employed by Cumberland River Coal Company (Cumberland) in 1991 when he ended his coal mine employment.  Banks smoked cigarettes most of his life: roughly one pack a day for thirty-eight years, followed by one half-pack a day from 2004 through 2007.  Banks filed his first claim for black lung benefits on February 3, 1992.  The claim was ultimately denied in 1996 by ALJ Richard L. Malamphy, who concluded that Banks's respiratory disease was due to his history of smoking, rather than his employment as a coal miner.  Banks filed a second claim for benefits on January 5, 2000.  That claim was denied by the district director in May 2002, and Banks did not request a hearing before an ALJ.

Banks filed his third claim on July 11, 2003.  In support, he presented medical evidence from Dr. Forehand and Dr. Rasmussen, both of whom diagnosed pneumoconiosis by x-ray.  Conversely, Cumberland's expert, Dr. Jarboe, stated that Banks's disability was due solely to smoking. Following an administrative hearing, ALJ Thomas F. Phalen, Jr., entered an order awarding benefits.  However, the Benefits Review Board (the Board) vacated the award and remanded the claim for reconsideration.[1]

---

[1]Specifically, the Board took issue with ALJ Phalen's finding that Banks "established a change in an applicable condition of entitlement pursuant to Section 725.309(d), based on new evidence of total respiratory disability," because the prior denial was actually based on the conclusion that Banks had failed to establish the existence of pneumoconiosis.  The Board also vacated the ALJ's finding that "the existence

On March 5, 2010, ALJ Larry Merck awarded benefits.[2]  He found that Banks had established a change in one of the applicable conditions of entitlement since his last claim because the new evidence established the existence of legal pneumoconiosis.  And after weighing all of the evidence in the record, ALJ Merck concluded that Banks had established legal pneumoconiosis.  Finally, the ALJ found that Banks had established total disability due to his legal pneumoconiosis.

Cumberland appealed the decision to the Board, arguing that ALJ Merck failed to compare the evidence in the prior, rejected claim to the new evidence when determining whether there was a change in condition.  The Board rejected this argument based on the plain language of the current version of the regulation governing subsequent claims, which provides that a claimant must "show that one of the applicable conditions of entitlement has changed . . . by submitting new evidence."  20 C.F.R. § 725.309(d).  It concluded that the amendment of this section marked a departure from the previous test for establishing a change in condition, so that an ALJ no longer needed to compare the new evidence to the evidence in the record.  Turning to the merits, the Board determined that ALJ Merck had properly weighed the opinion evidence before him.  And while it agreed with Cumberland that ALJ Merck should not have considered a medical report from 2001 because it was written before Banks's second claim was denied, it found the error to be harmless.  Thus, the Board affirmed the award of benefits.

## II.

The Black Lung Benefits Act (the Act) provides benefits to coal miners who become disabled due to pneumoconiosis.  30 U.S.C. § 901.  Pneumoconiosis is a "chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment."  30 U.S.C. § 902.  It is caused by the "long-term inhalation of coal dust" associated with work in coal mines.  *Gray v. SLC*

---

of pneumoconiosis was established by x-ray and medical opinion evidence."

[2]The case was assigned to ALJ Merck on remand due to Judge Phalen's retirement.

*Coal Co.*, 176 F.3d 382, 386 (6th Cir. 1999).  It is "latent and progressive," and thus "may first become detectable only after the cessation of coal mine dust exposure." 20 C.F.R. § 718.201(c).  The Act directs the Department of Labor (the Department) to "make payments of benefits in respect of total disability of any miner due to pneumoconiosis."  30 U.S.C. § 921(a).  To that end, it authorizes the Department to promulgate regulations to "prescribe standards for determining . . . whether a miner is totally disabled due to pneumoconiosis."  30 U.S.C. § 921(b); *see also* 30 U.S.C. § 923(a) (providing that claims be filed "in such manner, in such form, and containing such information, as the Secretary [of Labor] shall by regulation prescribe").

To prove entitlement to benefits under the Act, a miner must file a claim proving that: (1) he suffers from pneumoconiosis; (2) the pneumoconiosis "arose out of coal mine employment"; (3) he is totally disabled; and (4) the pneumoconiosis contributes to his total disability.  20 C.F.R. § 725.202(d)(2).  The first prong may be met by establishing that the miner suffers from either "clinical" or "legal" pneumoconiosis. "Clinical pneumoconiosis" is defined as a condition "characterized by permanent deposition of substantial amounts of particulate matter in the lungs and the fibrotic reaction of the lung tissue to that deposition caused by dust exposure in coal mine employment."  20 C.F.R. § 718.201(a)(1).  It is typically diagnosed using x-ray evidence.  *See Eastover Mining Co. v. Williams*, 338 F.3d 501, 509 (6th Cir. 2003) (describing clinical pneumoconiosis as a "lung disease caused by fibrotic reaction of the lung tissue to inhaled dust that is generally visible on chest x-ray films").  "Legal pneumoconiosis," on the other hand, includes "any chronic restrictive or obstructive pulmonary disease arising out of coal mine employment."  20 C.F.R. § 718.201(a)(2). Thus, legal pneumoconiosis "'encompasses a wider range of afflictions than does the more restrictive medical definition of pneumoconiosis.'"  *Cornett v. Benham Coal, Inc.*, 227 F.3d 569, 575 (6th Cir. 2000) (quoting *Kline v. Director, OWCP*, 877 F.2d 1175, 1178 (3d Cir. 1989)).

Due to the "latent and progressive" nature of pneumoconiosis, a miner is permitted to file a subsequent claim even after the entry of a final order denying a

previously filed claim. 20 C.F.R. § 725.309. A miner filing a subsequent claim does not start from scratch, however. A subsequent claim must be denied unless the miner "demonstrates that one of the applicable conditions of entitlement . . . has changed since the date upon which the order denying the prior claim became final." 20 C.F.R. § 725.309(d). If the miner seeks to prove that his physical condition has changed, he must submit "new evidence" to that effect. 20 C.F.R. § 725.309(d)(3). Once the miner establishes a change in condition through the newly submitted evidence, the ALJ must consider all the evidence in the record — old and new — to determine whether the claimant is entitled to benefits. 20 C.F.R. § 725.309(d)(4). A miner who succeeds on a subsequent claim cannot recover benefits for the period prior to any previous denial. 20 C.F.R. § 725.309(d)(5).

## III.

This court has a "limited scope of review over the decisions of the Benefits Review Board and the ALJ." *Saginaw Mining Co. v. Ferda*, 879 F.2d 198, 205 (6th Cir. 1989). Our "task 'is limited to correcting errors of law and ensuring that the Board adhered to the substantial evidence standard in its review of the ALJ's factual findings.'" *Crockett Collieries, Inc. v. Barrett*, 478 F.3d 350, 352 (6th Cir. 2007) (quoting *Creek Coal Co. v. Bates*, 134 F.3d 734, 737 (6th Cir.1997)). "Substantial evidence is defined as relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Martin v. Ligon Preparation Co.*, 400 F.3d 302, 305 (6th Cir. 2005) (citing *Peabody Coal Co. v. Groves*, 277 F.3d 829, 833 (6th Cir. 2002)). A decision that "rest[s] within the realm of rationality" is supported by substantial evidence. *Morrison v. Tenn. Consol. Coal Co.*, 644 F.3d 473, 478 (6th Cir. 2011) (internal quotation marks omitted). "We should not re-weigh the evidence or substitute our judgment for that of the ALJ." *Gray v. SLC Coal Co.*, 176 F.3d 382, 387 (6th Cir. 1999).

### "Change in Condition" Under 20 C.F.R. § 725.309(d)

Cumberland argues that the ALJ erred in finding that Banks had established a change in his condition. It asserts that ALJ Merck improperly applied the amended

version of 20 C.F.R. § 725.309(d) because he did not compare the old and new evidence to determine whether Banks's condition had changed since his last claim was denied. The federal appellee, the Director of the Office of Workers' Compensation Programs (the Director), contests this proposed interpretation of the regulation. He urges the court not to graft the Sixth Circuit's old test — which required the ALJ to evaluate the full record to determine whether the new evidence differs qualitatively from the old evidence — onto the new version of 20 C.F.R. § 725.309(d). Thus, both the Director and Banks assert that ALJ Merck properly applied the regulation when he evaluated only the new evidence to find that Banks's physical condition had changed.

Cumberland also disputes the ALJ's findings regarding the existence of legal pneumoconiosis and the contribution of that condition to Banks's total disability. It asserts that these findings must be reversed because the ALJ "failed to provide a valid basis for weighing the conflicting evidence." Banks, on the other hand, contends that the ALJ's findings are supported by substantial evidence and should be upheld.

ALJ Merck found that Banks "established legal pneumoconiosis by a preponderance of the newly-submitted medical report evidence." Because Banks established "a condition of entitlement previously adjudicated against him," the ALJ concluded that there was a "change in [an] applicable condition of entitlement." The Board affirmed, rejecting Cumberland River's "contention that the administrative law judge was required to conduct a comparison of the old and new evidence."

The current version of 20 C.F.R. § 725.309(d) became effective on January 19, 2001. It provides:

> If a claimant files a claim under this part more than one year after the effective date of a final order denying a claim previously filed by the claimant under this part, the later claim shall be considered a subsequent claim for benefits. A subsequent claim . . . shall be denied unless the claimant demonstrates that one of the applicable conditions of entitlement (see §§ 725.202(d) (miner), 725.212 (spouse), 725.218 (child), and 725.222 (parent, brother, or sister)) has changed since the date upon which the order denying the prior claim became final.

20 C.F.R. § 725.309(d) (2012) (full citations omitted).  The previous version of this section required that a subsequent claim be denied unless "there has been a *material change* in conditions."  20 C.F.R. § 725.309(d) (1999) (emphasis added).

According to the Department, the original regulation was intended to create a "one-element test," under which a miner could demonstrate a change in condition by submitting new evidence to prove the existence of a single element of entitlement decided against him in the earlier, unsuccessful claim.[3]  In *Sharondale Corp. v. Ross*, 42 F.3d 993 (6th Cir. 1994), this court adopted the one-element test advocated by the Department.  *Id.* at 997-98.  The court found that "to assess whether a material change is established, the ALJ must consider all of the new evidence, favorable and unfavorable, and determine whether the miner has proven at least one of the elements of entitlement previously adjudicated against him."  *Id.* at 997.

However, the *Sharondale* court departed from the agency's interpretation when it found that the ALJ erred when he failed to discuss "how the later [medical records] differ[ed] *qualitatively* from those submitted" earlier.  *Id* at 999 (emphasis added).  In remanding the claim on this ground, the court adopted an intrinsically more stringent test than that advocated by the Department.  Applying this modified one-element test in *Tennessee Consolidated Coal Co. v. Kirk*, 264 F.3d 602 (6th Cir. 2001), the court explained that an ALJ examining a miner's subsequent claim may only find a material change "if the new evidence both establishes the element *and* is substantially more supportive" of the miner's position.  *Id.* at 609.  The court held that to establish a material change in physical condition, the new evidence presented must have the "capability of converting an issue determined against the claimant into one determined in his favor."  *Id.* at 609 n.6.  Thus, under the Sixth Circuit's version of the one-element test, an ALJ was required to "compare the sum of the new evidence with the sum of the

---

[3]Some courts rejected this interpretation and held that "to bring a duplicate claim, a claimant must prove for *each* element that actually was decided adversely to the claimant in the prior denial that there has been a material change in that condition since the prior claim was denied."  *Wyoming Fuel Co. v. Director, OWCP*, 90 F.3d 1502, 1511 (10th Cir. 1996) (emphasis added).  The new version of 20 C.F.R. § 725.309(d) expressly overruled this interpretation.  65 Fed. Reg. 79920, 79968 (Dec. 20, 2000) (explaining that the revision was intended to codify the one-element test advocated by the Department); *see Energy W. Mining Co. v. Oliver*, 555 F.3d 1211, 1223 (10th Cir. 2009).

earlier evidence on which the denial of the claim had been premised" to find the existence of a material change in a miner's condition. *Id.* at 609.

The Fourth Circuit disagreed with this interpretation of 20 C.F.R. § 725.309(d) in *Lisa Lee Mines v. Director, OWCP*, 86 F.3d 1358 (4th Cir. 1996), stating that it did not "endorse . . . the closing paragraph of *Sharondale Corp.*, where, after adopting the Director's standard, the Sixth Circuit seems to have required consideration of the evidence behind the earlier denial to determine whether it 'differ[s] qualitatively' from the new evidence." *Id.* at 1363 n.11 (quoting *Sharondale*, 42 F.3d at 999). Instead, the Fourth Circuit "adopted a standard that presumed that the factual determinations underlying a prior denial are correct and simply required the miner to disprove the 'continuing validity' of at least one of the elements previously adjudicated against him in showing a material change in conditions." *Consolidation Coal Co. v. Williams*, 453 F.3d 609, 616 (4th Cir. 2006) (quoting *Lisa Lee Mines*, 86 F.3d at 1363).

Other circuits have joined *Lisa Lee Mines* in rejecting this court's addition to the one-element test. *See, e.g.*, *U.S. Steel Mining Co. v. Director, OWCP*, 386 F.3d 977, 988 n.12 (11th Cir. 2004); *Lovilia Coal Co. v. Harvey*, 109 F.3d 445, 454 n.7 (8th Cir. 1997). Moreover, questions have been raised within this circuit regarding the *Sharondale* test's propriety:

> It strikes me as rather schizophrenic of us in *Sharondale* to painstakingly analyze and weigh the competing "material change" interpretations, choose the Director's test, and then immediately afterwards, depart from the test that we have chosen to adopt. Because of this, I believe that the interpretation of *Sharondale* that the majority endorses is wrong. Furthermore, despite the fact that the ambiguous language of *Sharondale* leaves the meaning of the last paragraph open to multiple interpretations, the rest of the decision does acknowledge the principle that it is inappropriate to compare the evidence in a new claim with the evidence submitted in connection with a previously denied claim in assessing whether a "material change" has been established.

*Grundy Mining Co. v. Flynn*, 353 F.3d 467, 490 (6th Cir. 2003) (Moore, J., concurring).

The regulation was amended in 2000.  Among other changes, the Department removed the modifier "material," so that now a claimant must only demonstrate a change in condition.  *See* 20 C.F.R. § 725.309(d).  The Department addressed the alteration in the preamble to the amended regulations, explaining that the section created "a threshold test which allowed the miner to litigate his entitlement to benefits without regard to any previous findings by producing new evidence that established any of the elements of entitlement previously resolved against him."  65 Fed. Reg. at 79,968.  Further, the Department explicitly stated that the regulation was intended to codify the one-element test as articulated in *Lisa Lee Mines*.  *Id.*

Cumberland asserts that it "does not take any issue with the 'one element' test adopted in the latest version of Section 725.309."  However, it "submits that the 'one element' must be established by reasoned medical evidence establishing an actual 'change' in that element" since the denial of the prior claim.  Otherwise, it contends that "the requirement for 'change' is meaningless."  Cumberland maintains that the only way to give proper effect to the language of the regulation is to require the ALJ to compare the newly submitted evidence to the evidence in the record.  Thus, Cumberland urges the Court to maintain the one-element test from *Sharondale* and *Kirk*.

In disagreeing with Cumberland's proposed interpretation, the Director argues that "the present regulation plainly dispenses with [the] requirement" that an ALJ compare the new evidence with the evidence from the previously-denied claim.  He further asserts that the new regulation "does not authorize, much less compel, an ALJ to compare new evidence with old evidence as part of the change in conditions analysis."  Rather, the ALJ should compare the new evidence of the miner's physical condition "with the *conclusions* reached in the prior claim."  *U.S. Steel Mining Co.*, 386 F.3d at 989 (emphasis in original).

We now adopt the Director's interpretation of 20 C.F.R. § 725.309(d).  A court should "defer to an agency's interpretation of its own regulation, advanced in a legal brief, unless that interpretation is 'plainly erroneous or inconsistent with the regulation.'"  *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 880 (2011) (quoting *Auer v. Robbins*,

519 U.S. 452, 461 (1997)).  Here, because the interpretation advocated by the Director is neither plainly erroneous nor inconsistent with the language of the regulation itself, deference to the Director's position is appropriate.  Thus, we construe the term "change" to mean "disproof of the continuing validity" of the original denial, *Lisa Lee Mines*, 86 F.3d at 1363, rather than the "actual difference between the bodies of evidence presented at different times." *Kirk*, 264 F.3d at 609.  Under this definition, the ALJ need not compare the old and new evidence to determine a change in condition; rather, he will consider only the new evidence to determine whether the element of entitlement previously found lacking is now present.

ALJ Merck considered the new evidence submitted by Banks and Cumberland and found the opinions of Drs. Forehand and Rasmussen to be "reasoned, documented, and entitled to full probative weight."  Additionally, he found Dr. Jarboe's opinion to be "inadequately reasoned" and discounted it accordingly.  Balancing this evidence, the ALJ found that Banks suffered from legal pneumoconiosis and, therefore, had established a condition of entitlement previously adjudicated against him.  According to Cumberland, the ALJ's conclusions are not supported by substantial evidence.  We disagree with Cumberland's assessment of the proof presented to the ALJ.

**The ALJ's Evaluation of the Evidence**

ALJ Merck first considered the report prepared by Dr. Forehand on July 29, 2003.  Dr. Forehand "diagnosed clinical pneumoconiosis based on [Banks's] history, physical examination, x-ray and arterial blood gas study."  The ALJ found that the x-ray was insufficient evidence of clinical pneumoconiosis and, therefore, concluded that the opinion was "entitled to diminished weight" on the issue.  Dr. Forehand also diagnosed chronic bronchitis "based on [Banks's] history and his pulmonary function test results, and opined that the resulting impairment was caused by both cigarette smoking and coal dust exposure."  ALJ Merck found that this was "sufficient to establish that [Banks's] pneumoconiosis arose out of his coal mine employment."  As a result, he gave Dr. Forehand's report full probative weight on the issue of legal pneumoconiosis.

Banks also submitted two reports by Dr. Rasmussen: a report from February 26, 2001, and a report completed on March 29, 2004. ALJ Merck found that Dr. Rasmussen's 2001 report was entitled to full probative weight on the issue of legal pneumoconiosis, despite giving the opinion "little weight on the issue of clinical pneumoconiosis" due to Dr. Rasmussen's reliance on a negative x-ray. Turning to the 2004 report, ALJ Merck found the "diagnosis of legal pneumoconiosis well-reasoned and well-documented and accord[ed] it full probative weight." This report similarly diagnosed both clinical and legal pneumoconiosis, but the ALJ found the diagnosis of clinical pneumoconiosis to contain an insufficient explanation of how the physical examination, pulmonary function test, arterial blood gas study, and EKG supported the diagnosis. Regarding legal pneumoconiosis, however, Dr. Rasmussen found that the "pulmonary function tests showed a severe, irreversible obstructive ventilatory impairment," and concluded that "coal dust exposure [was] a significant contributing factor in [Banks's] pulmonary impairment."

Cumberland argues that the ALJ should not have relied on the opinions of Drs. Forehand and Rasmussen. It asserts that ALJ Merck's explanation for crediting the diagnosis of legal pneumoconiosis while simultaneously discrediting the diagnosis of clinical pneumoconiosis "is not supported by the record." This argument is unavailing because the definition of legal pneumoconiosis is significantly broader than that of clinical pneumoconiosis. *See Cornett*, 227 F.3d at 575. Dr. Forehand diagnosed both pneumoconiosis and chronic bronchitis. Dr. Rasmussen found that Banks suffered from respiratory impairments that he attributed, in part, to coal dust exposure. The ALJ adequately explained his reliance on the diagnoses, finding that each doctor "based his diagnosis on objective medical evidence, considered [Banks's] employment history and his smoking history, and explained the basis for his opinion." Rather than showing that he erred in finding these reports to be well-reasoned and well-documented, ALJ Merck's rejection of the diagnoses of clinical pneumoconiosis demonstrates careful examination of the record.

Cumberland also maintains that, because Drs. Forehand and Rasmussen relied on positive x-ray interpretations that were later discredited by the ALJ, there was not substantial evidence to support the conclusion that Banks suffers from legal pneumoconiosis. The Board rejected this argument, because both doctors merely relied on the x-rays to diagnose clinical pneumoconiosis, and the "additional diagnoses of legal pneumoconiosis [were based] on pulmonary function and blood gas studies showing obstructive ventilatory impairments and hypoxemia, together with [Banks's] coal mine employment and smoking histories." The doctors' use of the x-rays to diagnose clinical pneumoconiosis does not render ALJ Merck's reliance on their opinions to support his finding of legal pneumoconiosis unreasonable. The ALJ's findings of fact concerning the reports by Drs. Forehand and Rasmussen are within the "realm of rationality" and, therefore, are supported by substantial evidence. *Morrison*, 644 F.3d at 478.

ALJ Merck also considered a report dated September 24, 2003 from Dr. Jarboe, who relied upon patient history, an x-ray, a pulmonary function test, and an arterial blood gas study to diagnose Banks with chronic bronchitis and severe pulmonary emphysema. However, Dr. Jarboe concluded that Banks did not suffer from pneumoconiosis and averred that Banks's "pulmonary impairment was caused entirely by his smoking history."[4] ALJ Merck found that the reasons he provided for this conclusion were "inadequately reasoned on the issue of legal pneumoconiosis." As a result, he found that Dr. Jarboe's opinion had limited value.

> First, Dr. Jarboe opined that [Banks's] emphysema could not have been caused by coal dust exposure, because there is not enough dust retention shown on his x-rays. The Department of Labor and the Board have made clear that a miner can be found to have legal pneumoconiosis, even in the absence of clinical pneumoconiosis. . . . Further, the Board has found it proper to discredit a physician's opinion based on the notion that emphysema caused by coal dust does not occur absent clinical pneumoconiosis. Therefore, I find that the negative x-rays and CT scan are an inadequate basis for determining whether coal mine dust contributed to [Banks's] chronic bronchitis and emphysema.

---

[4] Dr. Jarboe submitted three supplemental medical reports reiterating his conclusion that Banks's emphysema was solely the result of cigarette smoking.

> Second, Dr. Jarboe opined that [Banks's] total lung capacity showed that there was no true restrictive component to his respiratory impairment. Legal pneumoconiosis may result from an obstructive impairment, regardless of any restrictive component. Physicians' opinions may be discredited if they find no pneumoconiosis due to an obstructive versus restrictive impairment. Here, the obstructive nature of [Banks's] impairment is not an appropriate basis for finding that smoking, alone, contributed to [his] chronic bronchitis and empysema.

These are proper reasons for finding Dr. Jarboe's reports unpersuasive.

ALJ Merck also found that "Dr. Jarboe's statement regarding the period of time since [Banks's] coal mine employment ceased is at odds with the Department of Labor's determination that coal mine dust exposure can cause a chronic pulmonary impairment after a latent period." As a result, the ALJ concluded that "his reasoning is unsound on the issue of whether coal dust exposure played a contributing or aggravating role in [his] disabling lung disease." Thus, the ALJ afforded Dr. Jarboe's opinions less probative weight than those of Drs. Forehand and Rasmussen on the issue of legal pneumoconiosis.

Cumberland asserts that ALJ Merck erred in finding Dr. Jarboe's conclusions to be inconsistent with Department regulations that recognize pneumoconiosis as a latent and progressive disease. It argues that the ALJ's interpretation of these regulations would "improperly convert[] every obstructive lung disease into 'legal' pneumoconiosis." Cumberland's argument mischaracterizes the ALJ's opinion. ALJ Merck did not imply that every respiratory impairment contracted after working in a mine will necessarily qualify as legal pneumoconiosis. He merely pointed out that Dr. Jarboe relied on an impermissible factor. Dr. Jarboe's opinion was indeed inconsistent with the regulations that recognize that pneumoconiosis "may first become detectable only after the cessation of coal mine dust exposure." 20 C.F.R. § 718.201(c). The ALJ did not err in discounting the opinion on this basis.

ALJ Merck erred in considering Dr. Rasmussen's 2001 report because it pre-dates the denial of his last claim and, therefore, cannot constitute new evidence. However, we find the error to be harmless because the ALJ's decision was supported by

two other medical opinions that were afforded full probative weight. There is no reason to believe that the ALJ would have given more weight to Dr. Jarboe's "inadequately reasoned" opinion in the absence of Dr. Rasmussen's 2001 report. The ALJ's finding that the newly-submitted evidence established legal pneumoconiosis was supported by substantial evidence. Thus, Banks succeeded in establishing a change in condition.

After ALJ Merck found that Banks had established the existence of legal pneumoconiosis through new evidence, he reviewed the entire record to determine if Banks could prove each element of entitlement by a preponderance of the evidence. On the issue of legal pneumoconiosis, the ALJ compared the medical evidence from Banks's two prior claims to the newly submitted evidence. ALJ Merck gave the medical evidence from the second claim probative weight, but afforded little weight to the medical evidence submitted in the first claim, which was filed in 1992. Therefore, he analyzed the 2000 reports by Dr. Rasmussen and Dr. Dahhan along with the newly submitted evidence to determine whether the balance of the evidence favored a finding of legal pneumoconiosis. The ALJ found that "the previously-submitted evidence does not contain a well-reasoned and well-documented opinion as to clinical or legal pneumoconiosis." As a result, he gave controlling weight to the new evidence.

ALJ Merck discounted the report provided by Dr. Dahhan because it "provided no credible basis for his opinion that cigarette smoking, alone, caused" Banks's impairment.[5] And like Dr. Jarboe, Dr. Dahhan based his opinion, in part, on the length of time since Banks left his coal mine employment. Thus, the ALJ discounted the opinion because it was "at odds with the Department of Labor's determination that coal mine dust exposure can cause a chronic pulmonary impairment after a latent period." Moreover, he found the opinion to be poorly reasoned because Dr. Dahhan "found it significant that [Banks] was prescribed bronchodilators by his treating physician, indicating that his respiratory condition is reversible." The ALJ found that "treatment

---

[5]The ALJ also found Dr. Rasmussen's 2000 opinion that diagnosed clinical and legal pneumoconiosis on the basis of an incorrect medical history as well as x-ray evidence that the previous ALJ had found to be negative, to be "inadequately reasoned and entitled to less probative weight on the issue of legal pneumoconiosis."

with bronchodilator agents and partial reversibility are not credible evidence," to support an opinion that coal dust did not contribute to Banks's respiratory impairment. Finally, because Dr. Dahhan relied on the lack of evidence of clinical pneumoconiosis to "rule out coal dust exposure as a cause" of Banks's condition – a position that is inconsistent with Department regulations – ALJ Merck accorded his opinion little probative weight regarding the issue of legal pneumoconiosis.

Cumberland also argues that ALJ Merck failed to give valid reasons for discounting Dr. Dahhan's contrary evidence. It asserts that "Dr. Dahhan based his medical judgment on the issue of pneumoconiosis upon all of the objective medical evidence" and, therefore, the ALJ erred in his assessment of the report. Even though the facts might permit an alternative conclusion, we cannot "substitute our judgment for that of the ALJ." *Gray*, 176 F.3d at 387. ALJ Merck gave three rational reasons for his decision to discount the opinion. Therefore, he "adequately explained the reasons for" discrediting the evidence. *Morrison*, 644 F.3d at 478. The ALJ did not err in discounting Dr. Dahhan's opinion. Instead, the ALJ's conclusion is supported by substantial evidence.

Finally, Cumberland argues that the ALJ erred by finding total disability due to pneumoconiosis. To establish his entitlement to benefits under the Act, a miner must prove by a preponderance of the evidence that his pneumoconiosis is a "substantially contributing cause" of his disabling respiratory ailment. 20 C.F.R. § 718.204(c)(1). Pneumoconiosis is considered to substantially contribute to a miner's disability if it has a "material adverse effect on the miner's respiratory or pulmonary condition" or it "[m]aterially worsens a totally disabling respiratory or pulmonary impairment which is caused by a disease or exposure unrelated to coal mine employment." 20 C.F.R. § 718.204(c)(1)(i)-(ii).

Here, ALJ Merck considered all of the medical opinion evidence before concluding that Banks had established total disability due to pneumoconiosis. He discounted the opinions of Drs. Jarboe and Dahhan because they based their disability causation opinions on the premise that Banks did not suffer from any form of

pneumoconiosis. However, he gave full probative weight to the opinions of Drs. Forehand and Rasmussen, both of whom concluded that Banks's disability was caused partly by his history of smoking and partly by his coal mine employment. Specifically, Dr. Rasmussen opined that Banks's "cigarette smoking and his coal mine dust exposure" both contributed to his disabling lung disease. And Dr. Forehand found that "[w]ere it not for claimant's coal mine employment, respiratory impairment would not be to the same degree."

Cumberland asserts that the opinions of Drs. Forehand and Rasmussen are "too conclusory and general to establish that Banks'[s] disability is substantially caused by 'legal' pneumoconiosis." Citing this court's opinion in *Conley v. National Mines Corp.*, 595 F.3d 297 (6th Cir. 2010), Cumberland contends that "such a conclusory medical opinion cannot suffice." However, *Conley* dealt specifically with a claim for survivor's benefits. In that context, a "substantially contributing cause" is one that "hastens the miner's death." *Id.* at 303 (citing 20 C.F.R. § 718.205(c)(5)). The *Conley* court was bound by previous precedents that held that "pneumoconiosis only 'hastens' a death if it does so through a specifically defined process that reduces the miner's life by an estimable time." *Eastover Mining Co.*, 338 F.3d at 518. Based on this definition of the term "hasten," the *Conley* court found that the doctor's opinion — that pneumoconiosis makes a person more susceptible to lung cancer — was conclusory and unsupported, and therefore "insufficient to support the determination that Mr. Conley's legal pneumoconiosis hastened his death." 595 F.3d at 303. In the present case, because Banks seeks benefits for himself, the standard for evaluating the medical evidence supporting ALJ Merck's finding of causation is not as stringent as that employed by the *Conley* court. *See Crockett Colleries*, 478 F.3d at 356 (affirming ALJ's finding of disability due to legal pneumoconiosis based on doctor's opinion that "coal dust exposure probably contributes to some extent in an undefinable proportion" (internal quotation marks omitted)).

In a claim for benefits brought by a miner, the opinions on which the ALJ relies "must reflect reasoned medical judgment" to support a finding of total disability due to

pneumoconiosis. *Flynn*, 353 F.3d at 483; *see* 20 C.F.R. § 718.204(c)(2) ("[T]he cause or causes of a miner's total disability shall be established by means of a physician's documented and reasoned medical report."). ALJ Merck correctly concluded that the opinions of Drs. Forehand and Rasmussen reflect reasoned medical judgment. Dr. Rasmussen based his opinion on the fact that both smoking and coal dust inhalation "cause lung tissue destruction even sharing some cellular and biochemical mechanisms." Additionally, as ALJ Merck notes, Dr. Rasmussen "rendered his opinion after he examined [Banks] on three occasions, obtained a history of [his] coal mine employment and cigarette smoking, and reviewed results from several objective medical tests." Dr. Forehand's opinion was similarly based on a physical examination, patient history, and objective medical test results. These opinions reflect reasoned medical judgments and the ALJ did not err in relying on them to conclude that Banks's legal pneumoconiosis was a substantially contributing cause of his total disability.

**IV.**

For the foregoing reasons, we affirm the award of benefits.