**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1460**

WESTMORELAND COAL COMPANY,

Petitioner,

v.

HERSKEL D. STALLARD; DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF
LABOR,

Respondents.

On Petition for Review of an Order of the Benefits Review Board.  (15-0156 BLA)

Argued:  September 12, 2017                    Decided:  November 29, 2017

Amended: December 21, 2017

Before KEENAN and WYNN, Circuit Judges, and John A. GIBNEY, Jr., United States
District Judge for the Eastern District of Virginia, sitting by designation.

Petition denied by published opinion.  Judge Wynn wrote the opinion, in which Judges
Keenan and Gibney joined.

**ARGUED:** Fazal Afaque Shere, BOWLES RICE LLP, Charleston, West Virginia, for
Petitioner.   Barry H. Joyner, UNITED STATES DEPARTMENT OF LABOR,
Washington, D.C.; Joseph E. Wolfe, WOLFE WILLIAMS & REYNOLDS, Norton,
Virginia, for Respondents.  **ON BRIEF:** Paul E. Frampton, BOWLES RICE LLP,

Charleston, West Virginia, for Petitioner. M. Patricia Smith, Solicitor of Labor, Maia S. Fisher, Acting Associate Solicitor, Gary K. Stearman, Counsel for Appellate Litigation, Rebecca J. Fiebig, Office of the Solicitor, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent Director, Office of Workers' Compensation Programs. Victoria S. Herman, WOLFE WILLIAMS & REYNOLDS, Mt. Hope, West Virginia, for Respondent Herskel D. Stallard.

_____

WYNN, Circuit Judge:

Petitioner Westmoreland Coal Company challenges a final decision and order by the U.S. Department of Labor Benefits Review Board (the "Board") granting federal disability benefits to Respondent Herskel Stallard, a retired coal miner, under the Black Lung Benefits Act (the "Black Lung Act"), 30 U.S.C. § 901 *et seq.* The Board affirmed a decision by the Administrative Law Judge ("ALJ") concluding that Stallard timely brought his claim and that Westmoreland failed to rebut the statutory presumption that Stallard was entitled to benefits. Because substantial evidence supports the award of benefits and the award accords with applicable law, we deny Westmoreland's petition for review.

I.

A.

Herskel Stallard worked as a coal miner throughout much of his adult life. In total, Stallard's career included more than thirty years of mining employment either underground or in conditions that were substantially similar to underground mines. Throughout much of this time, Stallard also smoked cigarettes. In particular, he testified that on workdays he smoked "one cigarette, maybe two"—and as much as half a pack per day otherwise—for thirty-nine years before quitting in 1993. J.A. 450.

Near the end of Stallard's career, several physicians advised him not to return to work due to breathing difficulties. In particular, around 1990 Dr. Charles P. Maine told Stallard that he had black lung disease that was "not real severe" but would continue

3

progressing the longer he worked in the mines. *Id.* at 447. Several years later, in March 1993, Stallard experienced carbon monoxide poisoning while working in a Westmoreland machine shop. Upon seeking treatment for the poisoning, two other physicians—Drs. Estocino and Dorman—each advised him not to return to work due to breathing difficulties. Dr. Estocino determined that the carbon monoxide poisoning would dissipate, but nonetheless advised Stallard to stop working in the mines to prevent further damage to his lungs. Dr. Dorman told Stallard that he was "permanently disabled" as a result of his impaired respiratory function. *Id.* at 448. Soon thereafter, on Dr. Dorman's advice, Stallard retired from the coal industry.

Nearly twenty years later, on March 22, 2011, Stallard filed a claim for Black Lung Act benefits. In connection with this claim, three physicians examined Stallard—Drs. Ronald Jay Klayton, James Gallai, and David M. Rosenberg. A fourth doctor, Dr. George L. Zaldivar, provided a medical opinion without conducting his own examination. Drs. Klayton and Gallai diagnosed Stallard with black lung disease.[1] Although Dr. Gallai opined that exposure to coal dust caused Stallard's condition, Dr. Klayton said that he could not "quantitate the relative contributions" of Stallard's exposure to coal dust and cigarette smoke in reaching his diagnosis. *Id.* at 223.

---

[1] Strictly speaking, Dr. Klayton diagnosed Stallard with "clinical" black lung disease, whereas Dr. Gallai found no basis for such a diagnosis and instead diagnosed Stallard with "legal" black lung disease. The distinction between these respective diagnoses is briefly discussed below, but is largely inconsequential to the present petition for review.

4

By contrast, Drs. Rosenberg and Zaldivar diagnosed Stallard not with black lung disease, but instead with severe chronic obstructive pulmonary disease ("COPD"). Based on his review of Stallard's treatment history, as well as his suspicion that Stallard concealed the true extent of his smoking habit, Dr. Rosenberg concluded that cigarette smoke was the "sole culprit" responsible for Stallard's breathing difficulties. *Id.* at 406. Similarly, Dr. Zaldivar testified that Stallard did not have black lung disease, attributing his severe lung impairment to a lifetime of asthma and smoking.

B.

On July 10, 2014, the ALJ presiding over Stallard's claim conducted a hearing to consider the medical and other evidence regarding Stallard's eligibility for Black Lung Act benefits. In addition to Stallard's live testimony at the hearing, the ALJ considered various exhibits, including transcripts of the depositions of Drs. Rosenberg and Zaldivar.

Roughly six months later, the ALJ issued a decision and order granting Stallard Black Lung Act benefits. The ALJ first found Stallard's claim timely filed. 30 U.S.C. § 932(f); *see also* 20 C.F.R. § 725.308(a). Next, in light of Stallard's long career in the mining industry, the ALJ applied a statutory presumption that Stallard's work in the mines caused or substantially contributed to any disabling lung disease he experienced. 30 U.S.C. § 921(c)(4); *see also* 20 C.F.R. § 718.305(b). The ALJ then concluded that: (1) the medical evidence demonstrated that Stallard suffered from a disabling lung disease; and (2) Westmoreland failed to rebut the statutory presumption that Stallard's disease was caused by exposure to coal dust. Accordingly, the ALJ determined that

5

Stallard was entitled to benefits under the Black Lung Act and found Westmoreland liable for those benefits as of March 1, 2011.

The Board affirmed the ALJ's decision on February 24, 2016. As to timeliness, the Board upheld the ALJ's finding that the medical advice Stallard received in the early 1990s did not put him on notice that he was totally disabled *due to* black lung disease. Likewise, the Board agreed that substantial evidence supported the ALJ's conclusion that the opinions of Drs. Rosenberg and Zaldivar were insufficient to rebut the presumption that Stallard's chronic lung disease was caused by his long-term exposure to coal dust. Westmoreland timely petitioned this Court for review.

## II.

The Black Lung Act provides disability benefits to former coal miners suffering from black lung disease (known medically as "pneumoconiosis"). 30 U.S.C. § 901(a). To be eligible for such benefits, miners must demonstrate that: (1) they have black lung disease; (2) the disease arose out of coal mine employment; (3) they are totally disabled; and (4) their black lung disease contributes to that total disability. 20 C.F.R. § 725.202(d).

Under applicable Department of Labor ("Labor Department") regulations, black lung disease is defined as "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." *Id.* § 718.201(a). The disease manifests in two forms: (1) "clinical" black lung disease, which includes a number of specific diagnoses associated with the accumulation of

6

particulate matter in the lungs; and (2) "legal" black lung disease, which is defined as "any chronic lung disease or impairment and its sequelae arising out of coal mine employment." *Id.* § 718.201(a)(1)–(2).

As revised in 2000, the Labor Department regulations are preceded by an extensive Preamble that "sets forth the medical and scientific premises relied on by the Department in coming to [its medical] conclusions in [crafting] its regulations." *Harman Mining Co. v. Dir., Office of Workers' Comp. Programs*, 678 F.3d 305, 314 (4th Cir. 2012). The product of notice-and-comment rulemaking, this Court must accord these conclusions substantial deference. *E. Associated Coal Corp. v. Dir., Office of Workers' Comp. Programs*, 805 F.3d 502, 512 (4th Cir. 2015). Accordingly, we repeatedly have held that ALJs may look to the Preamble in weighing medical opinions addressing the cause of a claimant's disabling lung disease. *See, e.g.*, *Harman Mining Co.*, 678 F.3d at 314–16; *Westmoreland Coal Co. v. Cochran*, 718 F.3d 319, 323 (4th Cir. 2013).

Once the Board makes a merits determination, the Black Lung Act allows for only "limited" judicial review to determine "whether substantial evidence supports the factual findings of the ALJ and whether the legal conclusions of the [Board] and ALJ are rational and consistent with applicable law." *Hobet Mining, LLC v. Epling*, 783 F.3d 498, 504 (4th Cir. 2015) (alteration in original) (quoting *Harman Mining Co.*, 678 F.3d at 310). Accordingly, we review the ALJ's factual findings for "substantial evidence"—i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[,]" *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 217 (1938)—and the Board's legal conclusions de novo, *Harman Mining Co.*, 678 F.3d at 310. To this end,

7

"we must be careful not to substitute our judgment for that of the ALJ," and thus "defer to the ALJ's evaluation of the proper weight to accord conflicting medical opinions." *Harman Mining Co.*, 678 F.3d at 310 (quoting *Stiltner v. Island Creek Coal Co.*, 86 F.3d 337, 342 (4th Cir. 1996)).

III.

In the instant petition, Westmoreland lodges four separate objections to the Board's determination that Stallard is entitled to Black Lung Act benefits. As a threshold matter, the company contends that Stallard's Black Lung Act application, which he filed nearly two decades after retiring from the coal industry due to breathing difficulties, is untimely under the statute's three-year limitations period. Next, assuming Stallard's claim was timely filed, the company argues that the ALJ improperly ignored evidence regarding the extent of Stallard's smoking history prior to his retirement. Along similar lines, Westmoreland contends that the ALJ erroneously discounted the opinion of one of its medical experts who claimed that a particular measure of Stallard's lung function demonstrated that his disability was caused by his smoking. And, finally, the company argues that the ALJ misapplied the so-called "rule out" standard in determining that Stallard's exposure to coal dust—and not his smoking—caused his disabling lung disease.

We address each contention in turn.

A.

Westmoreland first argues the ALJ erred in concluding that Stallard timely filed his 2011 claim for benefits, i.e., within three years of becoming aware of his permanent disability due to black lung disease. According to Westmoreland, the ALJ used an incorrect standard to determine whether Stallard was informed of his disability in sufficient detail so as to trigger the statute of limitations, and thus incorrectly weighed the evidence regarding timeliness. We disagree.

Miners seeking benefits under the Black Lung Act must file a claim "within three years after . . . a medical determination of total disability due to pneumoconiosis." 30 U.S.C. § 932(f). Labor Department regulations provide that the three-year filing window begins to run when a qualifying medical determination "has been communicated to the miner or a person responsible for the care of the miner." 20 C.F.R. § 725.308(a). The regulations further establish a "rebuttable presumption that every claim for benefits is timely filed." *Id.* § 725.308(c). If a respondent overcomes this presumption, however, the three-year limitations period is "mandatory and may not be waived or tolled except upon a showing of extraordinary circumstances." *Id.*

In the present case, Westmoreland first contends that the ALJ applied a different standard—one that requires a claimant to "be told that his breathing impairment and resulting disability was due *solely* to pneumoconiosis." Pet'r's Br. 10 (emphasis added). However, Westmoreland fails to specify any language in the ALJ's analysis that articulates or applies such a standard. To the contrary, the ALJ's decision tracks the

9

language of the relevant statutory and regulatory provisions, nowhere suggesting a heightened standard. Accordingly, we reject this argument.

This therefore leaves as the sole remaining question whether substantial evidence supports the ALJ's timeliness determination. On this front, Westmoreland argues that the opinions of the three physicians who treated Stallard in the early 1990s, when taken together, put him on notice that he was totally disabled due to black lung disease. However, the ALJ appropriately found otherwise. No one doctor communicated to Stallard a diagnosis of both total disability and black lung disease. Instead, around 1990 Dr. Maine told Stallard that he had not-yet-serious black lung disease that would continue to progress. Only later, as part of Stallard's 1993 treatment for carbon monoxide poisoning, did Dr. Estocino advise Stallard to stop working in the mines to prevent further damage to his lungs and Dr. Dorman tell Stallard that he was permanently disabled as a result of his impaired respiratory function. Notably absent from the 1993 doctors' diagnoses is any mention of black lung disease, and therefore any explicit medical determination of total disability *due to* pneumoconiosis.

Furthermore, even if Stallard had considered the doctors' disparate diagnoses in concert, he reasonably could have concluded that his black lung disease was *not* totally disabling during the relevant time period. As noted, Dr. Maine was the only one who diagnosed Stallard with black lung disease. However, according to Stallard, in rendering this diagnosis Dr. Maine explicitly indicated that the disease was not, at that time, severe and would continue to progress the more he worked in the mines. That Dr. Maine left open the possibility of Stallard returning to work suggests that he did not view Stallard as

10

totally disabled. And although Dr. Dorman subsequently told Stallard he was permanently disabled as a result of impaired respiratory function, Dr. Dorman did not identify any underlying cause. Even Dr. Estocino's diagnosis—rendered around the same time—merely "advised" Stallard to stop working in the mines to prevent further damage to his lungs. Given the imprecise nature of these medical opinions, substantial evidence supports the ALJ's conclusion that Stallard was never legally notified that he was totally disabled *due to* black lung disease. *See Tenn. Consol. Coal Co. v. Kirk*, 264 F.3d 602, 607 (6th Cir. 2001) (upholding ALJ's determination that claim was timely filed in part because "[a]lthough [one doctor] did diagnose [the claimant] with the initial stages of pneumoconiosis, he did not label him as 'totally disabled' on that basis or any other"), *superseded by regulation on other grounds as stated in Cumberland River Coal Co. v. Banks*, 690 F.3d 477 (6th Cir. 2012).

B.

Westmoreland next argues that the ALJ relied on an inaccurate smoking history in weighing the evidence. In particular, Westmoreland contends the ALJ's calculation of Stallard's smoking history at two to four pack-years[2] failed to account for contrary evidence and, regardless, is not supported by substantial evidence. We again disagree.

---

[2] A "pack-year" is calculated by multiplying the number of packs of cigarettes smoked per day by the total number of years an individual smoked. There are twenty cigarettes in a pack. So, a person who smoked fifteen cigarettes (3/4 pack) per day for forty years would have a thirty pack-year smoking history. By comparison, a person who smoked one cigarette (1/20 pack) per day over same period would have a two pack-year smoking history.

11

As an initial matter, the ALJ's decision addressed the relevant evidence concerning Stallard's smoking history, including Westmoreland's "conten[tion] that [Stallard's account of his] smoking history is inaccurate or has changed over time." J.A. 528 n.7. Ultimately, the ALJ credited Stallard's testimony that he "only smok[ed] 1 to 2 cigarettes per day," in part because Westmoreland elsewhere agreed that Stallard's "memory was excellent." *Id.* nn.7–8.

The crux of Westmoreland's remaining argument, then, is that the competing evidence of a higher smoking history undermines Stallard's credited testimony such that substantial evidence does not support the ALJ's two-to-four pack-year calculation. In this regard, Westmoreland notes that Stallard apparently offered varying descriptions of his smoking habits at other points in connection with his claim for benefits. For example, in June 2011, Dr. Klayton reported that Stallard smoked half a pack of cigarettes per day between 1973 and 1993, resulting in a ten pack-year smoking history. Likewise, Dr. Gallai reported a six pack-year history in his evaluation of Stallard in March 2012, and, in December 2013, a medical report prepared by Dr. Rosenberg mirrors the ten pack-year estimate upon which Dr. Klayton relied. Finally, some medical records reflecting Stallard's post-retirement treatment for other health problems indicate an even greater smoking history, charting as high as forty pack-years.

Unsurprisingly, Westmoreland focuses on the higher estimates catalogued above; however, the totality of evidence on this front is largely inconsistent. And in finding a two-to-four pack-year history, the ALJ expressly considered Westmoreland's arguments and instead chose to credit Stallard's testimony. Such a determination is within the

ALJ's prerogative as fact-finder to weigh the credibility of witnesses and determine the persuasiveness of their testimony. *W. Va. CWP Fund v. Bender*, 782 F.3d 129, 144 (4th Cir. 2015); *see Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) ("In reviewing for substantial evidence, we do not . . . reweigh conflicting evidence [or] make credibility determinations . . . .").

Furthermore, the ALJ's determination is bolstered both by several doctors' more modest pack-year estimates and other medical statements indicating a minimal smoking history, such as that Stallard "did smoke in the past, but intermittently, not heavily . . . ." J.A. 60; *see also Harman Mining Co.*, 678 F.3d at 311 n.2 (4th Cir. 2012) (disregarding conflicting evidence indicating claimant smoked between one-quarter pack per day and two packs per day beginning as early as 1968 and as late as 1980).

In sum, although the ALJ here chose to accept the lower end of a relatively wide range of evidence, we have stressed that we "must be careful not to substitute our judgment for that of the ALJ." *Harman Mining Co.*, 678 F.3d at 310. Under this standard, and given the array of evidence presented, substantial evidence supports the ALJ's calculation of Stallard's smoking history.

C.

Building on its claim that the ALJ underestimated Stallard's smoking history, Westmoreland next argues that the ALJ erred in discounting Dr. Rosenberg's reliance on a particular measure of lung function to support his conclusion that Stallard's disability resulted from smoking and not coal dust exposure. However, under similar circumstances both the Sixth Circuit and unpublished opinions from this Court have

13

rejected this argument. We agree with those decisions, and therefore conclude that the ALJ properly discounted Dr. Rosenberg's opinion.

At the heart of this issue is a measure of lung function referred to as the $FEV_1/FVC$ ratio. Among four pulmonary function tests identified in the Labor Department's Black Lung Act regulations as probative of a miner's total disability, this measurement compares the amount of air that a patient can forcibly exhale in the first second of exhalation with the total amount of air the patient can exhale in a single breath. *See* 20 C.F.R. § 718.204(b)(2)(i)(C). Under the regulations, a ratio of 55% or less is indicative of total disability due to black lung disease. *Id.*

Westmoreland does not dispute that a reduced $FEV_1/FVC$ ratio suggests that a patient suffers from lung impairment generally. According to the company, however, the ALJ improperly discounted Dr. Rosenberg's reliance on Stallard's $FEV_1/FVC$ ratio to further identify the specific *cause*—i.e., smoking, black lung disease, or both—of his disability. In particular, Dr. Rosenberg cited medical articles indicating that $FEV_1$ and FVC measurements together decline in patients suffering from black lung disease such that the corresponding $FEV_1/FVC$ ratio ordinarily remains undisturbed. By contrast, because Stallard's $FEV_1/FVC$ ratio *decreased* over time, Dr. Rosenberg posited, the medical evidence indicated that Stallard's history of smoking was the "sole culprit" of his disabling lung disease. J.A. 406.

As the ALJ explained, however, Dr. Rosenberg's hypothesis regarding $FEV_1/FVC$ ratios runs directly contrary to the agency's own conclusions in this regard. Specifically, the Labor Department's regulatory Preamble cites various studies indicating that coal

14

dust exposure *does* result in decreased FEV$_1$/FVC ratios. *See Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as Amended*, 65 Fed. Reg. 79,920-01, 79,943 (Dec. 20, 2000) (explaining that COPD stemming from exposure to coal dust "may be detected from decrements in certain measures of lung function, especially FEV$_1$ *and the ratio of FEV$_1$/FVC*" (emphasis added)). The Preamble is consistent with the corresponding regulation permitting claimants to demonstrate entitlement to Black Lung Act benefits based on a reduced FEV$_1$/FVC ratio. 20 C.F.R. § 718.204(b)(2)(i)(C). It is appropriate to give "little weight . . . to medical findings that conflict with the [Black Lung Act]'s implementing regulations." *Lewis Coal Co. v. Dir., Office of Workers' Comp. Programs*, 373 F.3d 570, 580 (4th Cir. 2004). And, under substantially similar circumstances, we have held that ALJs are permitted to give less weight to medical opinions that draw on medical studies purporting to distinguish between smoking-induced COPD and black lung disease. *See Cochran*, 718 F.3d at 323–24.

Nonetheless, Westmoreland argues that Dr. Rosenberg arrived at his medical opinion in this case based specifically on his review of the medical literature informing the Preamble, as well as more recent studies purportedly showing a link between reduced FEV$_1$/FVC ratios and smoking. However, Dr. Rosenberg's interpretation of the studies predating the Preamble relies on selective quotations. And the agency rejected such an interpretation when it promulgated the existing Black Lung Act regulations, *see Cent. Ohio Coal Co. v. Dir., Office of Workers' Comp. Programs*, 762 F.3d 483, 491 (6th Cir. 2014), after considering "the prevailing view of the medical community [and] the

15

substantial weight of the medical and scientific literature," 65 Fed. Reg. at 79,939. Likewise, the more recent studies do not address black lung disease at all and thus offer little support for Westmoreland's argument that the ALJ erred in disregarding Dr. Rosenberg's opinion. *See Cochran*, 718 F.3d at 323–24.

Accordingly, we—along with the Sixth Circuit—repeatedly have rejected Dr. Rosenberg's (and others') reliance on similar evidence to argue that Black Lung Act claimants are not entitled to benefits. *See McElroy Coal Co. v. Dir., Office of Workers' Comp. Programs*, 624 F. App'x 101, 102 (4th Cir. 2015); *Westmoreland Coal Co. v. Dir., Office of Workers' Comp. Programs*, 540 F. App'x 152, 153–54 (4th Cir. 2013) (per curiam); *see also Cent. Ohio Coal Co.*, 762 F.3d at 491–92; *Quarto Mining Co. v. Dir., Office of Workers' Comp. Programs*, 657 F. App'x 428, 432–35 (6th Cir. 2016); *Quarto Mining Co. v. Marcum*, 604 F. App'x 477, 482–84 (6th Cir. 2015).

In light of these authorities, as well as an ALJ's general prerogative to discount medical opinions at odds with the conclusions adopted by the agency itself, we conclude that the ALJ did not err in rejecting Dr. Rosenberg's opinion regarding the $FEV_1/FVC$ ratio's ability to show particularized causation.[3] *Cent. Ohio Coal Co.*, 762 F.3d at 491–92 ("The sole issue presented here is whether the ALJ was entitled to discredit Dr. Rosenberg's medical opinion because it was inconsistent with the [Labor Department] position set forth in the preamble, and the answer to that question is unequivocally yes.").

---

[3] Known in the medical profession as "etiology."

16

Finally, Westmoreland argues that the ALJ misapplied the so-called "rule out" standard in considering whether the company sufficiently rebutted the presumption that black lung disease caused Stallard's disability. As Westmoreland sees it, various errors in framing and application led the ALJ to apply a standard which was nearly impossible for the company to meet and led the ALJ to improperly discount the medical opinions of Drs. Rosenberg and Zaldivar. We disagree.

When a Black Lung Act claim is timely filed, the claimant generally bears the burden of demonstrating benefits eligibility. *See* 20 C.F.R. § 725.103. In some cases, however, the Black Lung Act shifts the burden to the party opposing eligibility. For instance, when a miner has more than fifteen years of below-ground mining experience, a chest x-ray fails to show the presence of complicated pneumoconiosis, and other evidence demonstrates a totally disabling respiratory or pulmonary impairment, there is a rebuttable presumption that he or she is disabled due to black lung disease and thus entitled to benefits. 30 U.S.C. § 921(c)(4). To rebut this presumption, an employer bears the burden of showing either that the miner did not have black lung disease or that "no part of the miner's respiratory or pulmonary total disability was caused by" the disease. 20 C.F.R. § 718.305(d)(1)(i)–(ii).

As a threshold matter, Westmoreland does not dispute that Stallard's long history of employment in the coal mining industry and diagnosis with a totally disabling lung disease make him presumptively eligible for Black Lung Act benefits under the statute's "15-year" presumption. Under Labor Department regulations, Westmoreland may

overcome this presumption either by showing that Stallard does not suffer from black lung disease or by proving that "no part of [Stallard]'s respiratory or pulmonary total disability was caused by" the disease. 20 C.F.R. § 718.305(d)(1). The second prong— known as the "rule out" standard—is the prong here at issue. *See Bender*, 782 F.3d at 135, 137–44 (tracing history of rule out standard and explaining that under latest regulations it requires an operator opposing benefits to "establish that the miner's disability is attributable exclusively to a cause or causes other than pneumoconiosis"). Consistent with Congress's purpose, the "rule out" standard imposes a "strict" and "significant burden on operators seeking to rebut the statutory presumption." *Id.* at 141.

In arguing that the ALJ's flawed articulation of the rule out standard led him to improperly discount Dr. Rosenberg's and Zalidvar's opinions, Westmoreland advances numerous objections. These include that the ALJ failed to account for Dr. Rosenberg's reliance on the $FEV_1$/FVC ratio; improperly decided to discount Drs. Rosenberg's and Zaldivar's consideration of more extensive smoking histories than the ALJ's two-to-four pack-year calculation; and improperly rejected these experts' conclusion that Stallard would have been equally disabled had he never worked in the coal mining industry. We conclude that none have merit.

Although many of Westmoreland's objections impliedly ask this Court to reweigh the medical opinions presented to the ALJ, we decline to do so. *Harman Mining Co.*, 678 F.3d at 310 ("Because the ALJ is the trier of fact, we 'defer to the ALJ's evaluation of the proper weight to accord conflicting medical opinions.'" (quoting *Stiltner*, 86 F.3d at 342)). Accordingly, because two physicians who examined Stallard here determined that

18

he suffered from disabling black lung disease, Westmoreland "undeniably [fac]es a substantial burden" in challenging the underlying conclusion that Stallard is entitled to benefits. *Bender*, 782 F.3d at 143. Nonetheless, the company takes particular issue with the ALJ's reliance on the Preamble in dismissing Drs. Rosenberg's and Zaldivar's alternative explanations for Stallard's disabling lung disease.[4]

Specifically, Westmoreland argues that the ALJ held Drs. Rosenberg and Zaldivar to an impossible standard in assessing whether their opinions categorically ruled out black lung disease as a cause of Stallard's breathing impairment. In Westmoreland's view, the ALJ relied on the Preamble's discussion of the additive effects of various risk factors to conclude that exposure to coal dust necessarily has *some* effect on a miner's lung functioning. So construed, Westmoreland posits, the Preamble would make it impossible to definitively rule out black lung disease as a substantially contributing factor to a miner-smoker's disabling lung disease.

Again, however, this argument contradicts both the regulations and our precedent. In awarding benefits, the ALJ explained that the opinions given by Drs. Klayton and

---

[4] Westmoreland's threshold argument—that the ALJ improperly discounted the opinions of Drs. Rosenberg and Zaldivar because they did not use "magic 'rule out' words"—is without merit. Pet'r's Br. at 18. The ALJ repeatedly explained that he discounted these doctors' opinions because they failed to explain or even address why coal mine dust could not have been a contributing or aggravating factor in this specific case. In other words, these doctors ruled out coal dust exposure as a potential cause simply because they viewed smoking to be the sole cause; however, because they solely focused on smoking, they nowhere addressed why coal dust could not have been an *additional* cause—a fundamental aspect of the legal inquiry. And, of course, these doctors' etiological conclusions also ran contrary to those rendered by Drs. Klayton and Gallai.

Gallai were "consistent with the prevailing view of the medical community as expressed by the Department in the Preamble to its regulations, where it noted that the effects of cigarette smoke and coal dust on chronic obstructive pulmonary disease and chronic bronchitis are additive." J.A. 545. More specifically, the ALJ cited language in the Preamble addressing in great detail the effects of smoking and exposure to coal dust before reaching the Preamble's "unequivocal" conclusion that "[e]ven in the absence of smoking, coal mine dust exposure is clearly associated with clinically significant airways obstruction and chronic bronchitis. The risk is additive with cigarette smoking." 65 Fed. Reg. at 79,940. Finally, Dr. Gallai further noted that—aside from the additive risk component—Stallard's "rapid decline [in lung function] over the past three years . . . is typical of . . . coal workers' pneumoconiosis." J.A. 300.

By contrast, the ALJ discounted the opinions of Drs. Rosenberg and Zaldivar because they were inconsistent with the Labor Department's additive-risk determination and not otherwise supported by the medical evidence in this case. In particular, both doctors conceded that Stallard's exposure to coal dust was sufficient to cause black lung disease. And both doctors principally relied on evidence regarding the relative impact of smoking and coal dust exposure on miners generally to conclude that Stallard's particularized exposure to coal dust did not significantly contribute to his disabling lung disease. Finally, the ALJ additionally discounted these opinions because they relied on a more significant smoking history than his two-to-four pack-year finding.

"'[A]s trier of fact, the ALJ is not bound to accept the opinion or theory of any medical expert,' but instead 'must evaluate the evidence, weigh it, and draw his own

20

conclusions.'" *Bender*, 782 F.3d at 144 (4th Cir. 2015) (alteration in original) (quoting *Underwood v. Elkay Mining, Inc.*, 105 F.3d 946, 949 (4th Cir. 1997)). The ALJ here did so based on all the evidence detailed above, and he did not lightly arrive at his conclusion that Westmoreland failed to rebut the statutory presumption. The decision below carefully laid out the components of each doctor's diagnosis and underlying rationales. The decision then meaningfully engaged with the medical science, relevant caselaw, and applicable regulations. Against this backdrop, the ALJ did not reversibly err in concluding that Westmoreland failed to carry its "strict" and "substantial" burden to completely rule out coal dust exposure as a cause of Stallard's disability.

IV.

In sum, substantial evidence supports the ALJ's decision and order to award Stallard benefits and the decision otherwise accords with applicable law. The Board therefore did not err in affirming the ALJ's decision and order, and we accordingly deny Westmoreland's petition for review.

*PETITION FOR REVIEW DENIED*

21